**STENA LINE (U.K.) LIMITED, Petitioner,**

v.

**SEA CONTAINERS LTD. and Ferry and Port Holdings Limited, Respondents.**

**No. 90 Civ. 6210 (PKL).**

United States District Court, S.D.New York.

March 14, 1991.

---

Skadden, Arps, Slate, Meagher & Flom, New York City (Robert E. Zimet, Jay B. Kasner, David J. Margules, Heidi B. Goldstein, Cedric M. Powell, Peretz Bronstein, of counsel), for petitioner.

White & Case, New York City (Richard W. Reinthaler, Paul L. Friedman, Christopher M. Curran, Victor J. DeSantis, of counsel), for respondents.

## OPINION AND ORDER

LEISURE, District Judge:

This action concerns the scope of an arbitrable dispute arising from the sale of a business. Petitioner, Stena Line (U.K.) Limited ("Stena") seeks an order compelling arbitration concerning a dispute over a balance sheet dated March 31, 1990, on which a post-closing adjustment to the purchase price is to be based. Respondents Sea Containers Ltd. ("Sea Containers") and its wholly owned subsidiary Ferry and Port Holdings Limited ("Holdings") do not object to arbitration, but ask this Court to limit the scope of the arbitration.

## BACKGROUND

In March 1990, Stena agreed to purchase from Sea Containers, through its subsidiary Holdings, a group of ferry businesses operating between England and the continent of Europe and between England and Ireland. Pursuant to the stock purchase agreement between the parties (the "Agreement"), there was to be a post-closing adjustment to the purchase price of $380 million.[1]

The adjustment was to be determined using two balance sheets, each balance sheet to be prepared by the entity managing the business when the relevant financial data became available. Thus, the first balance sheet, dated December 31, 1989, was to be prepared by Holdings, and the second, dated March 31, 1990, was to be prepared by Stena.

Section 1.3(a) of the Agreement required that the December 31 balance sheet

be prepared in conformity with the terms of this Agreement and present[ ] a true and fair view of the Ferry Business as of the date thereof. The December 31 Balance Sheet shall be prepared in accord-

---

1. Holdings is the principal obligor for the post-closing adjustment; Sea Containers is a guarantor of Holdings' obligations.

The parties dispute whether the post-closing adjustment formula consists of one or two separate adjustments. However, since only one adjustment seems to be at issue in the matter currently before the Court, the Court will refer to a single post-closing adjustment for the sake of simplicity.

ance with the books and records of the Ferry Business [and] in conformity with United Kingdom generally accepted accounting principles [UKGAAP], applied on a consistent basis with prior periods." Agreement at 11.

Section 1.3(c) of the Agreement imposed the same requirements on the March balance sheet, with the additional proviso that it "be prepared on a consistent basis with the policies set forth in the notes to the December 31 Balance Sheet." *Id.* at 16.

Section 1.4 of the Agreement provides for a "Post Closing Adjustment," which will adjust the sale price to account for changes in the business occurring during the period between the payment of initial consideration and the closing. This adjustment is to incorporate a calculation based in part on the "Losses," or decline in the figure designated as "net equity" from the December to the March balance sheet, with a cap of $20 million. *See* Agreement § 1.3(c), at 17. Thus, even if the difference were greater than $20 million, Stena's recovery would be based on the lower figure.

The party receiving each balance sheet was given 60 days after receipt to advise the opposing party in writing of the amounts and descriptions of any adjustments that the receiving party felt were necessary. Agreement at 12, 17. The Agreement provides for expedited arbitration of unresolved differences, in which they are to be submitted to an independent accountant of national standing in England.[2] Agreement § 1.3(d), at 18–19.

The closing was held on April 9, 1990. On April 5, 1990, Holdings delivered the December 31 balance sheet to Stena. Stena informed Holdings by telex of their belief that the December balance sheet was not prepared in accordance with the terms of the Agreement, but Stena did not dispute the matter formally at that time. Stena claims that this was because they had concluded that the operating losses for the quarter ending March 31 would easily exceed the $20 million cap, and that "if losses equaled or exceeded the $20 million cap, the December 31 balance sheet would have no economic impact on the parties." Petitioner's Memorandum of Law in Support of Its Motion to Compel Arbitration ("Pet. Mem.") at 5. Therefore, Stena decided not to go to the expense of auditing and arbitrating the matter.

However, Stena did state the following in its telex:

> The purpose of this letter is to advise you that we do not object to the net equity of December 31 Balance Sheet solely for the purpose of determining losses. Notwithstanding the foregoing, we do not agree or in any way concede that the December 31 Balance Sheet was prepared in accordance with the terms of Stock Purchase Agreement and do not waive any rights whatsoever in respect of the preparation of the March 31 Balance Sheet (and/or the adjustment).

Affidavit of Heidi B. Goldstein, sworn to Nov. 14, 1990, Exhibit 3.

**2.** Section 1.3(d) of the Agreement reads, in pertinent part:

> In the event that Holdings and Buyer [Stena] are unable to resolve any differences with respect to the December 31 Balance sheet or the March 31 Balance Sheet (and the Adjustment) within 60 days after receipt of the December 31 Balance Sheet by Buyer or the March 31 Balance Sheets by Holdings, as the case may be, then the issues remaining unresolved shall be determined as follows ...: Holdings and Buyer shall jointly select and retain an independent firm of certified public accountants of national standing and reputation in the United Kingdom (the "Independent Firm") for the purpose of resolving ... all remaining unresolved issues with respect to the December 31 Balance Sheet or the March

> 31 Balance Sheet (and the Adjustment), as the case may be.
> (i) Within fifteen (15) days following retention of the Independent Firm, Holdings and Buyer shall present or cause to be presented the issues that must be resolved with respect to the relevant balance sheet.
> (ii) Holdings and Buyer shall use their best efforts to cause the Independent Firm to render its decision as soon as is reasonably practicable ...; provided that Holdings and Buyer agree that the purpose of retention of the Independent Firm shall not include the conduct of its own independent audit of the relevant balance sheet but rather shall be limited to resolving the issues presented to it and matters related thereto.
> *Id.* at 18–19.

On July 6, 1990, Stena provided Holdings with the March 31 balance sheet. Stena prepared the March 31 balance sheet in a manner that it contends complied with the requirements of the Agreement, but which was not wholly consistent with the procedure used in the December 31 balance sheet. The March balance sheet required Holdings to pay Stena $32.3 million.

Holdings objected to the calculations in the March 31 balance sheet, and, on September 4, 1990, sent Stena a listing of the adjustments Holdings asserted were necessary to correct the March balance sheet. Holdings contends that the March balance sheet is not consistent with the December balance sheet, and is, therefore, not in conformity with the Agreement. Stena, on the other hand, contends that the December balance sheet did not comply with UK-GAAP, and did not present a "true and fair view" of the business, while the March balance sheet does.

Holdings interprets Stena's arbitration demand as, in part, an attempt to challenge the validity of the December balance sheet, a right that Holdings contends Stena has waived by its failure to object within the contractual sixty day period. Consequently, respondents ask this Court to "direct the arbitrator to accept as binding the December Balance Sheet and to follow its policies in resolving the disputes relating to the March Balance Sheet." Respondents' Memorandum of Law in Response to Petitioner's Motion to Compel Arbitration ("Resp. Mem.") at 34. In the alternative, respondents request the Court to direct the parties to proceed first to arbitrate any disputes over the December balance sheet, and then to proceed with a separate arbitration concerning the March balance sheet.

## DISCUSSION

This Court has noted previously that the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, "created a 'federal policy favoring arbitration,' which requires that courts 'rigorously enforce agreements to arbitrate.'" *Scher v. Bear Stearns & Co.*, 723 F.Supp. 211, 214 (S.D.N.Y.1989) (quoting *Moses H.*

*Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) and *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)); *see also Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 254–55, 97 S.Ct. 1067, 1073–74, 51 L.Ed.2d 300 (1977). Further, "'"[t]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."'" *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir.1988) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987) (quoting *Dean Witter, supra*, 470 U.S. at 218, 105 S.Ct. at 1241)).

This is not to say that courts will force arbitration when it was clearly not the intention of the parties to put a given matter under the province of an arbitration agreement. *See Chevron U.S.A., Inc. v. Consolidated Edison Co.*, 872 F.2d 534, 537 (2d Cir.1989). This Court has stated that "[i]t is fundamental that arbitration agreements are creatures of contract law." *Scher, supra*, 723 F.Supp. at 214. Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.... [A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985).

Once a court has determined that an arbitration clause exists, "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, supra*, 460 U.S. at 24–25, 103 S.Ct. at 941–942. In fact, "[t]he existence of an arbitration clause in [an

agreement] raises a presumption of arbitrability that can be overcome only if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Associated Brick Mason Contractors, Inc. v. Harrington,* 820 F.2d 31, 35 (2d Cir.1987) (quoting *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986)); *see also Kerr–McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 470 (2d Cir.1991).

■ In trying to determine the scope of arbitration provisions, courts have distinguished between "narrow" and "broad" arbitration clauses. Broad clauses purport to refer all disputes arising out of a contract to arbitration, while narrow clauses limit arbitration to a specific type of dispute. *See McDonnell Douglas, supra,* 858 F.2d at 832. "With narrower clauses ... a court considering the appropriate range of arbitrable issues must 'consider whether the [question at] issue is on its face within the purview of the clause.'" *Id.* at 832 (quoting *Rochdale Village, Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)).

■ The clause in question here is clearly a narrow one. The Agreement prescribes arbitration only for disputes concerning the two balance sheets. In addition, the Agreement explicitly prohibits the arbitrator from conducting an independent audit, and puts a number of express restrictions on his inquiry. Thus, the Agreement identifies only a small subset of all possible disputes as arbitrable. Consequently, this Court must determine the relevant scope of the arbitration ordered herein. All conditions precedent have been satisfied for arbitration to occur regarding the March balance sheet. The sole issue is the extent to which the arbitrator may consider the December balance sheet as well.

Holdings is correct in asserting that the December balance sheet is not arbitrable at this point. The procedures set out in the Agreement were not satisfied in regard to the December balance sheet.[3] The remaining issue, which concerns the extent to which procedures used in the December balance sheet must be followed in the March balance sheet, is within the province of the arbitration. The Agreement dictates, *inter alia,* that both balance sheets are to present a "true and fair view" of the business, and are to comply with UK-GAAP, to be applied "on a consistent basis" with prior periods. The March balance sheet has the additional requirement of consistency with the "policies set forth in the notes" to the December balance sheet. However, that provision does not necessarily mandate that all procedures used in preparing the December balance be slavishly followed in preparing its successor, to the exclusion of all other requirements.

■ The provisions of the Agreement make clear that the arbitrator has a duty to determine whether the March balance sheet complies with *all* of the requirements of the Agreement. This Court must grant him full rein in weighing the importance of each of the requirements, and the proper balance to be struck among UKGAAP standards, consistency, and a "true and fair" picture of the business. The Court will not prevent the arbitrator from analyzing the December balance sheet, and indeed assumes that the arbitrator will do so, to the extent necessary to determine its impact on the March balance sheet. The arbitrator shall determine whether the March balance sheet is in accord with the Agreement. If in doing so the arbitrator determines that the December balance sheet does not comply with the Agreement, the arbitrator shall not alter the findings of the December balance sheet, unless the parties agree otherwise. However, the arbitrator need not be constrained to reapply any incorrect procedures to the March balance sheet, but

---

**3.** To the extent that Stena's telex may have attempted to preserve the right to contest the validity of the December balance sheet, it is in direct contravention of the conditions for arbitrations set forth in the Agreement, and is, therefore, unsuccessful.

shall be free to apply the correct standards as dictated by the Agreement.[4]

### CONCLUSION

For the reasons set forth above, the Court grants Stena's petition to compel arbitration concerning the March 31 balance sheet, with the restriction that the arbitrator cannot alter the results of the December 31 balance sheet without the consent of all parties. The Court does not, however, restrict the arbitrator from examining the December balance sheet, nor from examining the validity of the procedures used therein, for purposes of determining whether the proper procedures were used in preparing the March balance sheet.

SO ORDERED.

---

**4.** The Court notes there may be an internal tension in the requirements of the Agreement. For example, if the December balance sheet did not comport with UKGAAP, there may be difficulty in assessing the March balance sheet because of the requirements of both UKGAAP standards and "consistency." However, it is for the arbitrator to determine the requirements of the Agreement as they concern the March balance sheet.