**GESTETNER HOLDINGS, PLC, Petitioner,**

v.

**NASHUA CORPORATION, Respondent.**

No. 91 Civ. 7293 (WCC).

United States District Court, S.D. New York.

Feb. 10, 1992.

Debevoise & Plimpton, New York City, for petitioner; Steven Klugman, Marianne Consentino, Frances L. Kellner, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for respondent; William C. Sterling, Jr., Paul Vizcarrondo, Jr., George S. Canellos, Scott E. Eckas, McLane, Graf, Raulerson & Middleton, P.C., Manchester, N.H., of counsel.

OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This petition to compel arbitration (the "Petition") is brought pursuant to Sections 4 and 201 of the Federal Arbitration Act, 9 U.S.C. §§ 4, 201, pursuant to an arbitration provision in the Purchase Agreement between petitioner Gestetner Holdings PLC

("Gestetner") and respondent Nashua Corporation ("Nashua").[1]

## BACKGROUND

Gestetner is a company incorporated under the laws of England and Wales, with its principal place of business in London, England. Gestetner is engaged in, *inter alia*, the business of selling office machines and office products. Petition ¶ 3.

Nashua is a corporation organized under the laws of the state of Delaware, with its principal place of business in Nashua, New Hampshire. Nashua is engaged in manufacturing coated products and photographic processing. Petition ¶ 4.

The Petition alleges that since December 1990, Gestetner and Nashua have had a dispute about what adjustment should be made in the purchase price under the Purchase Agreement. Petition ¶ 2. Pursuant to the Purchase Agreement, Gestetner purchased from Nashua the stock or assets relating to office machine and office product businesses in 16 foreign countries (the "Foreign Businesses") for $148.1 million in cash, plus other consideration, for a total price of $152.2 million, exclusive of net debt. Petition ¶¶ 7, 9.

Pursuant to Section 1.5(a) of the Purchase Agreement, Nashua had delivered to Gestetner an unaudited December 31, 1989, balance sheet before the Purchase Agreement was signed (the "Unaudited Balance Sheet"). Petitioner alleges that the initial $152.2 million purchase price was based on the net book value of the Foreign Businesses as shown on the Unaudited Balance Sheet plus $30 million. Petition ¶ 9.

Pursuant to Section 1.5 of the Purchase Agreement, the purchase price was subject to adjustment after the closing of the sale of the Foreign Businesses and the preparation of an audited balance sheet. Petition ¶ 19.

Pursuant to Section 1.5(b), within 90 days after the closing, Nashua was required to deliver to Gestetner a balance sheet as of the closing date, audited with respect to the Foreign Businesses by Nashua's independent accountants, Price Waterhouse. Section 1.5(c) provides that the difference between the net book value of the Foreign Businesses as shown in the Closing Balance Sheet (the "Closing Date Net Book Value") and the net book value as shown in the Unaudited Balance Sheet is to be added to or subtracted from the purchase price. Petition ¶ 11. Thus, the final purchase price would be the Closing Date Net Book Value plus $30 million.

Under Section 1.5(b), Gestetner had the right to object to the Closing Date Net Book Value before the purchase price adjustment was finalized. Section 1.5(b) requires the Closing Balance Sheet to be prepared in accordance with United States generally accepted accounting principles ("GAAP"), and consistent with the accounting principles applied in the preparation of the Unaudited Balance Sheet. GAAP compliance is not required, however, with respect to non–GAAP matters that were disclosed both in the notes to the Unaudited Balance Sheet as of year-end 1989 and in the notes to the Closing Balance Sheet. Petition ¶ 12.

The Purchase Agreement provides that if Gestetner asserted objections, the parties would have 15 days to reach agreement on the objections. If the parties did not re-

---

1. Petitioner brought the present action in this Court after respondent had commenced an action in the U.S. District Court for the District of New Hampshire seeking, *inter alia*, a declaratory judgment that Gestetner is not entitled to submit the dispute concerning Gestetner's objections to the Closing Balance Sheet to arbitration except to the extent that Gestetner may claim that the Closing Balance Sheet was not prepared in all respects consistent with the accounting principles applied in the preparation of the Unaudited Balance Sheet. In the proceeding before this Court, respondent moved to dismiss or for a stay, arguing that this Court should defer to the earlier-filed New Hampshire action and should not reach the merits of the petition to compel. In the New Hampshire action, petitioner moved for a stay and for transfer to this Court pursuant to 28 U.S.C. § 1404(a).

In an order dated January 28, 1992, Judge Devine granted petitioner's motion to transfer the New Hampshire action to this Court. In light of Judge Devine's decision, respondent's motion to dismiss or for a stay is moot, and this Court now decides only the issue of arbitrability.

solve the objections in 15 days, the dispute was to be submitted to the accounting firm of Peat Marwick Main & Co., which is now KPMG Peat Marwick, ("Peat Marwick"), for a final and binding determination. Petition ¶ 14.

The closing date of the sale of the Foreign Businesses was April 2, 1990. Nashua delivered the Closing Balance Sheet to Gestetner on or about September 10, 1990. It showed a Closing Date Net Book Value for the Foreign Businesses of $124,188,000, or $1,961,000 more than the net book value of $122,227,000 in the Unaudited Balance Sheet. Petition ¶ 17.

By agreement of the parties, Gestetner's 90–day period to deliver its objections began to run on September 24, 1990, so that Gestetner had until December 8, 1990, to make its objections. On December 7, 1990, Gestetner delivered to Nashua extensive objections to the Closing Balance Sheet, including 187 objections in 18 categories, totalling $24,313,000. Petition ¶ 19. The objections raise numerous technical accounting issues. Certain of the objections have been revised, based on further inquiry, with the net effect of reducing the total objections by $3,349,000, to $20,964,000. Petition ¶ 20.

During the 15 days after Nashua received the objections, the parties did not resolve any of them. Therefore, Gestetner contends that, as of December 21, 1990, the parties had, and continue to have, a dispute that is to be arbitrated before Peat Marwick pursuant to Section 1.5(b) of the Purchase Agreement. Petition ¶ 21.

Gestetner did not commence arbitration when the 15–day contractual period expired on December 21, 1990. Instead, from December 1990 through October 2, 1991, Gestetner and Nashua met, corresponded and had telephone conversations in an effort to settle all or part of their dispute. Petitioner alleges that throughout this period of settlement negotiations, Nashua repeatedly asserted that the matter would be brought to arbitration if the parties failed to reach agreement. Petition ¶ 25. Petitioner further alleges that it was not until August, 1991, that Nashua even intimated that it would contend that some of Gestetner's objections were beyond the scope of the arbitration provision in the Purchase Agreement.

Petitioner alleges lastly that Nashua has gone to great lengths to delay defending Gestetner's claim in arbitration and has succeeded in extending the time before arbitration from the contractual 15–day period to 10 months. Accordingly, Gestetner seeks an order directing Nashua to proceed forthwith to arbitration in New York City before Peat Marwick and an award of its costs and disbursements of this action.

## DISCUSSION

Both parties agree that the Petition is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. The Supreme Court has consistently recognized that the FAA "establishes a federal policy favoring arbitration." *See, e.g., Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987). Thus, " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration ... [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration....' " *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–35, 103 S.Ct. 927, 941–47, 74 L.Ed.2d 765 (1983)).

Of course, this does not imply that courts will force arbitration when it was clearly not the intention of the parties to place a given matter within the ambit of an arbitration agreement. *See Chevron U.S.A. Inc. v. Consolidated Edison Co.*, 872 F.2d 534, 537 (2d Cir.1989). Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.... [A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi*, 473 U.S. at 626, 105 S.Ct. at 3354.

In determining the scope of arbitration provisions, courts have "at times distinguished between 'broad' clauses that purport to refer to all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes." *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988). "When 'dealing with a narrower arbitration clause, ... it will be proper to consider whether the conduct in issue is on its face within the purview of the clause.'" *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980) (quoting *Rochdale Village, Inc. v. Public Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir.1979)). "Thus, even though even a narrow arbitration clause must be construed in light of the presumption in favor of arbitration, the court is not free to disregard the explicit boundaries set by the agreement between the parties." *Chevron*, 872 F.2d at 537–38 (citing *McDonnell Douglas*, 858 F.2d at 832).

Here the explicit boundaries set by the parties are articulated in Section 1.5(b) of the Purchase Agreement, which provides that the Closing Balance Sheet shall be consistent with GAAP and with the accounting principles applied in the preparation of the Unaudited Balance Sheet. Section 1.5(b) further provides that:

The Purchaser [Gestetner] and its representatives shall have the right to review all work-papers and procedures used to prepare the Closing Balance Sheet and the calculation of the Closing Date Net Book Value and shall have the right to perform any other reasonable procedures to verify the accuracy thereof. Unless the Purchaser, within 75 days after the receipt of the Closing Balance Sheet and the Closing Date Net Book Value, notifies the seller in writing that it objects to the Closing Date Net Book Value and specifies the basis for its objection, the Closing Date Net Book Value shall become final and binding on the Parties for purposes of this Agreement. If the Purchaser and Seller are unable to resolve such objection within 15 days after any such notification has been given, the dis-

pute shall be submitted to Peat Marwick Main & Co.... Such accounting firm shall make a final and binding determination as to the matter or matters in dispute.

While this provision is technically a "narrow" one in that it does not provide for arbitration of all disputes between the parties, it is "broad" insofar as it does not restrict the scope of objections to the Closing Net Book Value that may be brought before Peat Marwick. In the instant case, petitioner objected to the Closing Date Net Book Value on the grounds, among others, that the Closing Balance Sheet failed to comply with GAAP. This objection, petitioner avers, is precisely the type that Section 1.5(b) contemplates for arbitration.

Nashua offers a different interpretation of Section 1.5(b). According to Nashua, Gestetner's objections are not properly subject to determination by Peat Marwick under Section 1.5(b) because Gestetner's objections are covered by other provisions of the Purchase Agreement. Nashua's argument may be summarized as follows: (1) the Closing Balance Sheet is required to be consistent with the Unaudited Balance Sheet; (2) the Unaudited Balance Sheet is required to comply with GAAP; (3) therefore, a contention that the Closing Balance Sheet fails to comply with GAAP is actually a contention that the Unaudited Balance Sheet fails to comply with GAAP; and (4) because the Purchase Agreement provides that indemnification is the exclusive remedy for claims that the Unaudited Balance Sheet fails to comply with GAAP, it is also the exclusive remedy for contentions that the Closing Balance Sheet fails to comply with GAAP.

Nashua's argument is unpersuasive. First, Nashua fails to appreciate the significance of the Second Circuit's recent decision in *Chung v. President Enters. Corp.*, 943 F.2d 225 (2d Cir.1991). In *Chung*, a buyer and seller had agreed to arbitrate only breach of warranty disputes. When the buyer sought to compel arbitration, the seller argued that the buyer's claims, although presented as warranty claims, were in fact claims based on a failure to achieve

projected revenues and therefore were not covered by the narrow arbitration agreement. The Second Circuit rejected this argument, characterizing it as one "directed at the merits of the dispute rather than the issue of arbitrability." 943 F.2d at 230. The court noted that "to determine arbitrability we need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue." The court held that because the buyer's claims could be interpreted as warranty claims, arbitration was required, even though an arbitrator might "subsequently agree with [seller's] interpretation of the agreement." *Id.*

■ *Chung* makes it clear that where claims may be understood to raise an arbitrable issue, arbitration must be compelled, even if the claims can also be characterized another way. Here, the question is not even close. Gestetner's objections are objections to the Closing Date Net Book Value. Section 1.5 of the Purchase Agreement certainly may be understood to make such objections arbitrable. Section 1.5(b) provides that disputes over Gestetner's objections are to be submitted to Peat Marwick and in no way limits the nature of objections Gestetner may bring. Thus, not only may Gestetner's objections be understood to be arbitrable, but also Gestetner's objections appear, after facial consideration, to be clearly within the scope of the arbitration agreement, notwithstanding Nashua's attempt to portray them otherwise. Here, as in *Chung*, respondent's arguments relate to the merits [2] of Gestetner's objections—whether they are defective under the Purchase Agreement itself—and are thus more appropriately brought before the arbitrator.[3]

■ Second, Nashua's attempt to rebut the plain meaning of the arbitration provision in Section 1.5(b) is undercut by

---

**2.** In addition to its argument that Gestetner's objections violate the exclusivity provision of the Purchase Agreement, Nashua contends that Gestetner's objections are not arbitrable because they are not within the context of the Section 1.5, which Nashua avers is intended only to measure any changes in the net asset value of the Foreign Businesses from December 31, 1989 to the Closing Date. Like Nashua's exclusivity clause argument, this argument relates to the merits of Gestetner's objections and would be more appropriately resolved by the arbitrator. Nor is *Melun Industries, Inc. v. Strange,* 1990 WL 180534, 1990 U.S. Dist. LEXIS 15213, 90 Civ. 2027 (S.D.N.Y. Nov. 13, 1990), to the contrary. *Melun* is distinguishable from the present action on a number of different points. Most significantly, the price adjustment clause in *Melun* explicitly provided that the clause was to measure only the change in book value during a defined period. Thus, the arbitrator exceeded his authority by taking into consideration factors not solely intervening during the specified period. Here Section 1.5 provides no such specified period of limitation and the Court therefore cannot rule that Gestetner's objections, which allegedly consider inaccuracies that occurred prior to December 31, 1989, are beyond the scope of arbitration.

**3.** Also noteworthy in this context is *Stena Line (U.K.) Ltd. v. Sea Containers, Ltd.,* 758 F.Supp. 934 (S.D.N.Y.1991). Like the instant case, *Stena Line* was a purchase price adjustment case involving balance sheets as of two dates. Both balance sheets were required to comply with UKGAAP, applied on a consistent basis. The latter balance sheet was also required to be consistent with the policies set forth in the notes to the earlier balance sheet. As here, the parties contested the roles of GAAP and consistency. Although both balance sheets in *Stena Line* were subject to arbitration, the first balance sheet was fixed and could not be attacked in the arbitration because the conditions precedent to arbitration had not been fulfilled. Thus, while it is true, as Nashua asserts, that the contract at issue in *Stena Line* lacked the exclusivity clause found here, the facts of *Stena Line* are remarkably close to the facts of the instant case.

In compelling arbitration, the court observed that the contract's consistency provision did "not necessarily mandate that all procedures used in preparing the [earlier] balance sheet be slavishly followed in preparing its successor, to the exclusion of all other requirements." 758 F.Supp. at 938. The court further held:

[T]here may be an internal tension in the requirements of the Agreement. For example, if the [earlier] balance sheet did not comport with UKGAAP, there may be difficulty in assessing the [later] balance sheet because of the requirements of both UKGAAP standards and 'consistency.' However, it is for the arbitrator to determine the requirements of the Agreement as they concern the [later] balance sheet.

*Id.* at 939 n. 4. Even assuming, as Nashua suggests, that there is tension between the requirements of GAAP and consistency in the Purchase Agreement, here, as in *Stena Line,* such tension is to be resolved by the arbitrator.

Nashua's own behavior prior to litigation.[4] The parties' practical interpretation of their contract prior to litigation provides "compelling evidence of the parties' intent." *Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.,* 743 F.2d 85, 91 (2d Cir.1984).[5] As the Supreme Court has observed: "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913). *See also Viacom International, Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 & n. 3 (S.D.N.Y.1980) (applying the rule that the parties' practical interpretation is entitled to great if not controlling weight).

Here, Nashua's conduct demonstrates that it shared Gestetner's understanding that this dispute is within the arbitration agreement. From December 1990 until at least June of 1991, Nashua appears to have acknowledged that the dispute over Gestetner's objections was subject to arbitration. For example, on December 13, 1990, one week after Nashua received Gestetner's objections, William Luke, Nashua's vice-president of finance and chief financial officer, stated the following in a letter to Gestetner: "Pursuant to the Agreement, if Gestetner and Nashua are unable to resolve Gestetner's objections within 15 days of notification, the dispute shall be submitted to arbitration." Copsey Ex. C.

On June 11, 1991, more than six months after Nashua had received Gestetner's objections, Luke stated in a letter to Gestetner that "we believe that it is appropriate at this time to start the arbitration process." Later in the same letter he proposed that Peat Marwick "be contacted so that the parties can begin the process of selecting an arbitrator and so that we can begin discussing the appropriate scope of the arbitration. . . ." Copsey Ex. G.[6]

Luke included with his June 11, 1991, letter a proposed joint letter to Peat Marwick from Nashua and Gestetner. The proposed joint letter stated: "Pursuant to Section 1.5 of the Purchase Agreement . . . any disputes relating to the audited net book value of the [Foreign Businesses]that the parties are not able to resolve shall be submitted to KPMG Peat Marwick for arbitration." *Id.*

The Court finds these statements reflecting the parties' practical interpretation of the contract to be highly probative of the intended meaning of Section 1.5(b), notwithstanding Nashua's insistence that it consistently expressed concern about the scope of the arbitration.[7]

---

4. Nashua contends that in assessing its pre-litigation conduct, this Court may not make use of materials that were allegedly part of settlement negotiations between the parties. Nashua's contention is based on a misinterpretation of Federal Rule of Evidence 408, which prohibits the use of settlement discussions only if "used to prove liability for or invalidity of the claim or its amount." Gestetner makes no such use of settlement discussions here; instead, Gestetner has used the discussions only to show Nashua's practical, pre-litigation understanding of Section 1.5(b).

5. Nashua's argument that its communications with Gestetner occurred after a controversy had arisen is unpersuasive since the standard typically employed by courts is that these acts precede litigation. *See Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.,* 743 F.2d 85, 91 (2d Cir.1984).

6. Nashua interprets this portion of the letter as supporting its position that Nashua disputed the scope of arbitration all along. Nashua's argument is wholly unconvincing, however, when the letter is considered as a whole. As Gestetner notes, the proposed discussion of the "appropriate scope of the arbitration" was to occur after the parties had advised Peat Marwick that any disputes as to the Closing Date Net Book Value were to be arbitrated. Thus Luke's words apparently referred to matters such as the nature and scope of discovery and the length of time of the arbitration—and certainly not to non-arbitrability, which would have been wholly inconsistent with the letter and its attachments.

7. While it may be true that Nashua expressed concern about the scope of the arbitration just prior to the commencement of litigation, this is not enough to rebut Gestetner's showing that Nashua's behavior in the eight previous months indicated its acceptance of the arbitrability of Gestetner's objections.

## CONCLUSION

For the above stated reasons, the Court grants Gestetner's petition to compel arbitration and directs the parties to proceed forthwith pursuant to Section 1.5(b) of the Purchase Agreement.

SO ORDERED.