In the Matter of the Arbitration—
between—

**WHIRLPOOL CORPORATION,**
Petitioner,

v.

**PHILIPS ELECTRONICS,**
N.V., Respondent.

93 Civ. 5026 (RWS).

United States District Court,
S.D. New York.

April 1, 1994.

Davis Polk & Wardwell, New York City (William E. Wurtz, Vincent T. Chang, Jonathan K.M. Crawford, of counsel), for petitioner.

Sullivan & Cromwell, New York City (Garrard R. Beeney, Anthony C. Walsh, of counsel), for respondent.

## OPINION

SWEET, District Judge.

Plaintiff Whirlpool Corporation ("Whirlpool") has moved for an order confirming a foreign arbitral award pursuant to 9 U.S.C. § 207. Defendant Philips Electronics N.V. ("Philips") has moved for an order dismissing or, in the alternative, staying this action pending arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–14, 201–208.

For the reasons set forth below, Whirlpool's motion for an order confirming a foreign arbitral award is granted. Philips' motion to dismiss or stay this action is denied.

### The Parties

Whirlpool is a corporation duly incorporated under the laws of Delaware. Whirlpool manufactures and sells major domestic appliances ("MDAs") [1] and related components in

---

**1.** In the Reorganization and Purchase Agreement between Whirlpool and Philips, MDAs are defined to include the following items: washing machines, dishwashers, dryers, refrigerators, freezers, air conditioners, cooking units and other larger appliances.

various countries throughout the world. Whirlpool's principal offices are in Benton Harbor, Michigan.

Philips is a corporation duly incorporated under the laws of the Netherlands. Philips is the parent corporation of a number of multinational companies which manufacture and sell numerous products, including: consumer electronics, medical diagnostic imaging equipment, lighting products and domestic appliances. Its principal place of business is in the Netherlands.

### Prior Proceedings and Facts

Whirlpool and Philips formed a joint venture pursuant to the terms of the Reorganization and Purchase Agreement (the "RPA") which was entered into on August 18, 1988. Under the RPA, Whirlpool acquired a controlling interest in certain of Philips' operations which included, among others, the European and Asian MDA operations. The RPA also gave Whirlpool the option[2] to acquire additional operations in other locations (the "Optioned Operations"), including the subject of this action—Philips' Argentine MDA Optioned Operation. *See* RPA § 7.5.

A few months later, on January 2, 1989, Whirlpool and Philips entered into Amendment No. 1 of the RPA. Among other provisions, Amendment No. 1 specifically revised § 7.5 of the RPA which provides for the Whirlpool's right to acquire Philips' MDA Operation in Argentina. Pursuant to Amendment No. 1, the Argentine operations were to be acquired by Whirlpool as soon as Philips resolved certain tax questions with the Argentine government, but no later than January 1, 1992. Amendment No. 1 specifically provides that "Philips shall contribute

to the JVC as soon as practicable after final decision by the relevant government authorities in Argentina concerning the tax preferences mention in Section 7.5(b), but no later than January 1, 1992, the MDA Operations located in Argentina...." RPA Amendment No. 1 at 2.

This transfer was entered into on January 7, 1992, pursuant to the "Sagad/Sofigad Contribution Agreement" (the "Contribution Agreement") between Whirlpool and Philips. Both Amendment No. 1 and the Contribution Agreement extended the principles of the RPA.[3] In addition, both Amendment No. 1 and the Contribution Agreement specify that the level of assets shown on the Argentine closing financial statements would determine whether Philips would have to pay Whirlpool (in the event the debt to equity ratio reflected on the balance sheet was above 50:50), or whether Whirlpool would have to compensate Philips (if the ratio was below 50:50). Amendment No. 1 at 3–4; Contribution Agreement at 7.

### Dispute Resolution Under the RPA

The RPA contains two provisions concerning the resolution of disputes, § 4.4 and § 13.6. Section 4.4 of the RPA provides the following resolution procedure for disputes concerning financial statements:

> 4.4 *Procedure for Disputes Concerning 1988 Financial Statements.* In the event of any dispute arising between WHIRLPOOL and PHILIPS with regard to the financial statements referred to in Section 4.3(a), the Parties shall endeavor to resolve such dispute within 60 days after delivery of the report of Ernst & Whinney. Should

---

2. The option to purchase the Argentine and several other South American operations is set forth in § 7.5 of the RPA, which provides in relevant part: "Philips agrees that the JVC shall have the option to acquire such MDA Operations located in Argentina ... as are designated by Whirlpool to Philips within 90 days after the execution of this Agreement (the "Optioned Operations"). Any such Optioned Operations will be acquired by the JVC on January 1, 1992 (or at such earlier or later date as the Parties and JVC may agree);" RPA § 7.5. at 49.

3. Under Amendment No. 1, the revised § 7.5 provides, in relevant part that "[t]he Optioned Operations shall be considered Dedicated Opera-

tions for all purposes of the Reorganization Agreement, and the contribution of the Optioned Operations to the JVC shall be made in accordance with the terms and conditions set forth in the Reorganization Agreement." RPA Amendment No. 1 at 2.

Similarly, the Contribution Agreement states: "Unless otherwise specifically defined herein, each term used herein which is defined in the [RPA] shall have the meaning assigned to such term in the [RPA]. Except as amended hereby all of the terms of the [RPA] shall remain and continue in full force and effect and hereby confirmed in all respects." Contribution Agreement at 2–3.

they be unable to do so the Parties shall refer the disputed matters for resolution to Arthur Andersen & Co. or such other major accounting firm as the Parties may agree, and shall instruct such independent public accountants to follow PHILIPS' Accounting Policies in resolving any disputed matters. The determinations by such independent public accountants shall be made within sixty (60) days after the presentation to them of the disputed matters, and such determinations shall be final and binding on the Parties. The fees and disbursements of any independent public accountants to which disputed matters shall be referred shall be shared equally by WHIRLPOOL and PHILIPS.

RPA § 4.4 at 23.

The second dispute resolution provision in the RPA, § 13.6, provides that disputes, "other than disputes referred to in Section 4.4," first shall be settled by negotiations between the Parties, and in the event an amicable settlement is not consummated, then the dispute shall be "submitted for decision and final resolution to arbitration to the exclusion of any courts of law, under the rules of Conciliation and Arbitration of the International Chamber of Commerce." RPA § 13.6 at 81.

### The Dispute Over the Argentine Contribution

In conjunction with the transfer to Whirlpool of the Argentine assets and pursuant to § 3 of the Contribution Agreement, Philips delivered to Whirlpool certain financial statements concerning Argentina. Whirlpool's accountants, Ernst & Young, challenged certain accounting methods used in these statements. Whirlpool notified Philips on April 22, 1992 that it believed the financial statements provided by Philips had not been computed in accordance with the Contribution Agreement. Whirlpool listed 13 matters, all but one of which have been resolved.

The unresolved matter, which is, of course, the subject of this action, concerns Philips' revaluation of the equity in the transferred Argentine operations. Philips, applying

"current cost accounting," revalued its fixed assets annually to reflect their alleged current values.[4]

Originally, the revaluation of fixed assets for the Argentine operation was to have been governed under what was known as "Schedule G (*Argentina*)," a document which was appended to the Contribution Agreement. Philips refused to sign this document at the time of the signing of the Contribution Agreement stating that: "As is noted in the definition paragraph of the Argentine Contribution Agreement (*"PHILIPS* Accounting Policies"), it was contemplated to add an amended *Schedule G* to the contract on *Argentina*. However, presumably because of the type of arrangement covered in the Agreement itself, this idea was dropped by the lines somehow and not really pursued in the discussions." Pl.'s Ex. J, Philips' Mem. of Nov. 12, 1992 at 3.

Whirlpool contends that by default the RPA required Philips to revalue the Argentine in accordance with the relevant provisions of Schedule G of the RPA:

*Fixed Assets.* Normal revaluation procedures will be followed in the various countries in which the Dedicated Operations are conducted, but the resulting changes in net book value as of December 31, 1988 when compared with January 1, 1988 will not, in percentage terms, exceed the official exchange rate fluctuation of the applicable local currency between January 1, 1988 and December 31, 1988 as compared with the Dutch Florin.

RPA, Schedule G at 1–2.

Philips, in turn, argues that it is inappropriate to apply Schedule G of the RPA (which concerns currency changes in 1988) for the entire three year period reflected in the 1991 Argentine financial statements. Philips bolsters its argument that the Schedule G in the RPA is inapplicable by noting that the Contribution Agreement refers to a distinct "Schedule G (*Argentina*)."

---

**4.** It should be noted that even Philips no longer ascribes to these accounting methods since, as of fiscal year 1992, Philips changed its accounting policies to conform to the historical cost basis accounting principles commonly used by American companies. Pl.'s Mem. in Opp'n at 8 n. 5.

### Arthur Andersen Arbitration

Whirlpool submitted the dispute to arbitration before Arthur Andersen & Co. ("Andersen") on September 24, 1992 pursuant to § 4.4 of the RPA.[5] An engagement letter was duly accepted and signed by Whirlpool on January 12 and by Philips on January 13, 1993.

Andersen held two informal fact-finding meetings at Philips' offices in Eindhovan on January 11, 1993 and at Whirlpool's offices in Benton Harbor on January 15, 1993. An additional meeting was conducted, attended by representatives of both parties, in Andersen's Paris offices on January 28, 1993. Documents and extensive submissions as well as replies to Andersen's request for additional information, dated February 1, 1993, were all considered by Andersen. Andersen Draft Report at 4.

On March 12, 1993, Andersen released its arbitration report to the parties. Whirlpool and Philips assented to Andersen's findings in twelve of the thirteen matters put forward for arbitration. However, Philips challenges the thirteenth matter—Andersen's determination regarding the revaluation of the Argentine MDA fixed assets.

In its description of the scope of the arbitration, Andersen stated:

> We understand that Schedule G (Argentina) was meant to be a modified version of the Schedule G annexed to the [RPA]. Both parties have agreed that neither at the time of signature of the Contribution Agreement nor subsequently, was a Schedule G (Argentina) agreed upon and/or signed by the parties. Pursuant to the discussions with the parties, we undertook our arbitration engagement without considering any potential legal issue with respect to the non-existence of the Schedule G (Argentina). Accordingly, we make no comment with respect to a potential legal issue associated with this matter.

> We have concluded on the basis of the provisions of Amendment [No.] 1 to the [RPA] and on the basis of the stipulations of the Contribution Agreement, that Schedule G of the [RPA] is a part of the Contribution Agreement and remains and continues in full force as to the meaning assigned to its terms and as to its intended purpose.

> Schedule G to the RPA includes specific provisions regarding limitations in the revaluation of fixed assets. Therefore the non-existence of Schedule G (Argentina) is of particular relevance in connection with the first issue under dispute ("fixed assets revaluation").

> In absence of Schedule G (Argentina) we based our conclusions in the dispute regarding the revaluation of fixed assets on the provisions of the [RPA] and on our understanding of the intent of the parties as expressed by the original Schedule G of the [RPA].

Andersen Draft Report at 3.

Andersen's report set forth a rationale for its determination on the thirteenth matter in Whirlpool's favor:

> According to the Contribution Agreement, the Audited 1991 Financial Statements in the case of Argentina, were to have been prepared in accordance with Philips Accounting Policies, which are defined as "Philips' normal accounting policies consistently applied ........ as modified by the policies set forth in Schedule G (Argentina)".

> As confirmed by both parties, no mutually agreed upon Schedule G (Argentina) exists. However, as discussed before, Schedule G of the [RPA] is considered to be a part of the Contribution Agreement. Therefore, its intended purpose should be assessed in the disputed matter regarding the revaluation of fixed assets of the Argentine M.D.A. Operations.

---

**5.** Initially, the arbitration was assigned to Ronald A. Bryce, an Andersen partner in Miami with over 20 years of experience in Latin America and Europe. Pl.'s Ex. W, Andersen letter of Sept. 4, 1992. However, on September 24, 1992, Philips objected to the choice of a Miami venue. On October 6, 1992, Philips requested that R.L. Measelle, the Managing Partner of Arthur Andersen, select a different Andersen arbitrator. On October 20, 1992, in accordance with Philips request, Andersen selected Mr. James Hooton ("Hooton"), the Managing Partner of Arthur Andersen's Audit and Business Advisory Practice in Paris.

Schedule G defines that normal revaluation procedures for fixed assets will be followed in the various countries in which the Dedicated Operations are conducted. However, the resulting changes in net book value as of December 31, 1988 when compared with January 1, 1988 will not, in percentage terms, exceed the official exchange rate fluctuations of the applicable local currency between January 1, 1988 and December 31, 1988 as compared with the Dutch Florin.

Based upon the understanding we obtained during the Arbitration Proceedings, we believe that this provision was intended to give Whirlpool some control over the maximum amount of revaluation as of fixed assets in the Settlement Balance Sheet in comparison to the value assigned to such fixed assets according to financial information that was available to Whirlpool in mid 1988, at the time of the signature of the [RPA].

Since the Argentine M.D.A. Operations were transferred three years after the initial transfer of the Dedicated Operations, the possible unfavorable consequences of revaluations outside Whirlpool's control were extended over a considerably longer period. The delay in the transfer of the Argentine M.D.A. Operations until January 1992 was apparently not caused by Whirlpool nor was it Whirlpool's desire to postpone the transfer until that date.

The three references in the Contribution Agreement to "Schedule G (Argentina)" seem to indicate that the parties intended to agree that some revaluation restrictions should also apply in the case of the transfer of the Argentine M.D.A. Operations, over three years after the initial transfer. While Philips agrees that the schedules to the [RPA] also apply to the Argentine transaction, they have indicated that applying the revaluation restrictions in accordance with the original Schedule G would not be fair and appropriate for an extended (3 year) period of time. With regard to this, however, it should be noted that neither before nor during the arbitration proceedings, did Philips offer another reasonable alternative mechanism to restrict the revaluation of fixed assets.

Andersen Draft Report at 5–7.

Using this rationale, Andersen determined that the fixed asset revaluation required "[t]he adjustment requested by Whirlpool is to be made to the Settlement Balance Sheet for the amount of 3,731,340 ten thousand australes [approximately 3.8 million dollars]." Andersen Draft Report at 5. The net result of Andersen's determination is that in order to achieve the 50:50 debt to equity ratio, Philips would be required to pay Whirlpool half that amount, to the tune of $1.9 million.

In objecting to Andersen's award, Philips states that Andersen acknowledged that there was a legal issue about what the parties intended by "Schedule G (Argentina)" and that Andersen declined to resolve that question. Philips contends that Andersen "ignored" the reference in the Contribution Agreement to Schedule G (Argentina). Accordingly, Philips urges this Court to dismiss or stay Andersen's award pending a second arbitration pursuant to § 13.6 of the RPA. By opposition, Whirlpool contends that Andersen's award, properly made pursuant to § 4.4 of the RPA, should be confirmed by this Court.

The motions were originally filed before the Honorable Pierre N. Leval in November 1992. Upon Judge Leval's ascension to the Court of Appeals, this action was reassigned to this Court on December 21, 1993. Oral argument was heard on the motions on January 19, 1994 which were considered fully submitted at that time.

## Discussion

### I. Standards for Judicial Review of An Arbitration

The confirmation of an arbitration award is generally a summary proceeding that converts a final arbitration award into a judgment of the Court. *Ottley v. Schwartzberg*, 819 F.2d 373, 377 (2d Cir.1987) (citing *Florasynth Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir.1984)). There is an "oft-stated federal policy, embodied in the Federal Arbitration Act, 9 U.S.C. § 1 et seq., favoring the enforcement of arbitration agreements and the confirmation of arbitration awards."

*Wall Street Assocs., L.P. v. Becker Paribas, Inc.,* 818 F.Supp. 679, 682 (S.D.N.Y.1993) (citing *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

It is well established that judicial review of arbitration awards are narrowly circumscribed. *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 265 (2d Cir.1989). "An arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988) (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir.1978)).

With these rather strict standards for this Court's review and confirmation of this award in mind, the case at hand may now be considered.

## II. Andersen Properly Exercised Jurisdiction Over The Dispute

### A. Authority of Arbitration Proceedings

■ Philips asserts that Andersen lacks authority under the terms of the RPA to resolve the dispute which concerns the type of accounting policies to be applied to the Argentine valuation. However, the courts which have previously considered this question have generally held that contracts with provisions providing for accounting arbitration of financial statements, such as this one, should be broadly construed to cover all disputes but for those which are expressly excluded. *See, e.g., Elox Corp. v. Colt Indus., Inc.,* 952 F.2d 395 (4th Cir.1991) (unpublished per curiam) (requiring accounting arbitration over issue relating to closing adjustment as the "contract itself does not limit the scope of arbitration" in its accounting arbitration provision); *Singer Co. v. Tappan Co.,* 593 F.2d 545, 549 (3d Cir.1979) (finding that accounting arbitration was "the exclusive fo-

rum for the resolution of these complex accounting disputes."); *Gestetner Holdings, PLC v. Nashua Corp.,* 784 F.Supp. 78, 82 (S.D.N.Y.1992) (finding accounting arbitration clause "in no way limits" the scope of the arbitration.).

To resubmit this dispute to another arbitrator, pursuant to the general provisions for dispute resolution in § 13.6, is contrary to established case law[6] which holds that disputes under agreements containing both specific and general arbitration clauses must be arbitrated under the particularized clause. *See, e.g., Delta Holdings Inc. v. National Distillers & Chemical Corp.,* 945 F.2d 1226, 1248 (2d Cir.1991) (holding "[u]nder New York law, '[a] specific provision will not be set aside in favor of a catchall clause.' ") (citations omitted), *cert. denied,* — U.S. —, 112 S.Ct. 1671, 118 L.Ed.2d 390 (1992); *William Higgins & Sons, Inc. v. State of New York,* 20 N.Y.2d 425, 428, 284 N.Y.S.2d 697, 699, 231 N.E.2d 285, 286 (1967).

In this case, there is a specific provision for resolving this dispute—that is § 4.4 of the RPA—which requires that "final and binding" arbitration concerning financial statements be conducted before Andersen. Hence, as the parties have fully participated in arbitration under this provision, which is recognized in the contract to be final and binding, it would be both uneconomical and judicially imprudent to submit this dispute to still further arbitration under § 13.6 of the RPA.

### B. Plain Language of the RPA is Consistent with Andersen's Exercise of Jurisdiction

Even in the absence of such precedent, the plain language of the RPA indicates that the parties contemplated that financial statement disputes, such as the valuations methods at issue in this case, should be governed by the dispute resolution mechanism provided for in § 4.4 of the RPA. Section 4.4 provides that "[i]n the event of any dispute arising between Whirlpool and Philips with regard to the financial statement referred to in Section 4.3(a) ... the Parties shall refer the disputed matters for resolution to Arthur Ander-

---

**6.** The RPA is governed by New York law. *See* Pl.'s Ex. C, RPA § 13.11 at 84.

sen...." RPA § 4.4 at 23. Included in § 4.3 are the very financial statements concerning the valuations of assets which Philips turned over to Whirlpool pursuant to the Argentine transaction. Further, the language of § 13.6 precludes the contemplation of "disputes referred to in Section 4.4." RPA § 13.6.

The vortex of this dispute swirls around the valuation of the asset figure for the Argentine operations on the financial statements. Notwithstanding Philips' arguments to the contrary, it is difficult to consider this question as anything but a straightforward accounting dispute. This finding is underscored by the fact that the remedy sought by both parties simply consists of an upward or downward valuation of the same asset figure on the Argentine financial statements. Accordingly, it appears that Philips may not in good faith first fully participate under § 4.4 which purports to be a "final and binding" process, only to turn around, in wake of an outcome with which it disagrees, and assert its alleged rights of "appeal" under § 13.6.

Philips contends that this thirteenth matter is a "legal dispute" and that § 4.4 excludes legal issues of contract interpretation relating to what the parties intended. However, § 4.4 appears to be designed to deal with accounting policies and the plain language of § 13.6 states that questions concerning financial statements are the exclusive domain of the accountant arbitrators under § 4.4.

Disputes over financial statements which rise to the level of external third party accountant arbitration necessarily involve complex analytical questions requiring a determination of what accounting policies and methods should be applied. Philips recognized this greater purpose of the Andersen arbitration when it wrote that, as with the prior arbitration between Philips and Whirlpool over the accounting policies to be applied in the European transactions, the Argentine arbitration: "was primarily intended to resolve how a number of Philips Accounting Policies should be interpreted and used in the valuation and consolidation process pursuant to the RPA, for which Philips Accounting Policies had been accepted as common basis subject to certain exceptions as specified in Schedule G to the RPA." Pl.'s Ex. H, Philips letter of Sept. 24, 1992 at 2.[7]

### C. *Andersen's Determination of the Scope of its Authority Deserves Deference*

■ Andersen's decision as to the scope of its arbitral authority is entitled to deference. *See Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie Du Papier (RAKTA),* 508 F.2d 969, 976 (2d Cir.1974) (finding a "powerful presumption that the arbitral body acted within its powers."); *Franklin Elec. Co. v. International Union, United Auto., Aerospace & Agricultural Implement Workers,* 886 F.2d 188, 191 (8th Cir.1989) (finding "growing consensus in the Circuits" that parties who submit to arbitration cannot later assert that arbitrator has no authority to resolve the issue.) (citing cases); *Local 369, Util. Workers Union v. Boston Edison Co.,* 752 F.2d 1, 3 (1st Cir.1984) (finding where parties submit arbitrality question to the arbitrator, decision entitled to same deference otherwise given arbitrator's award).

Philips points out that Andersen made "no comment with respect to a potential legal issue associated with this matter." Andersen Draft Report at 3. However, as set forth above, Andersen openly contemplated the question of whether the revaluation of fixed

---

7. Additionally, during the Arbitration, Philips argued that Andersen should interpret and adopt various accounting policies on several other matters. *See, e.g.,* Pl.'s Ex. Q, Philips letter of Jan. 12, 1993 at 2 (Andersen should "determine whether and to what extent the qualifications specified in Schedule G to the Main Agreement of August 18, 1988 override the PHILIPS Accounting Policies as generally applied"); Pl.'s Ex. R at 2, Philips letter of Jan. 13, 1993 (Andersen should determine "which accounting principles should reasonably be held applicable in the absence of such agreed Schedule G (Argentina)"); Pl.'s Ex. J at 6 (arguing against the use of original Schedule G and calling for Andersen to apply Philips' "normal accounting policies"); Pl.'s Ex. M at 2 (" 'Philips concedes that Schedules of the RPA (including Schedule G) apply to the contribution of the Argentine MDA, but disputes the manner in which they are applicable' "); Pl.'s Ex. O at 2 ("Philips does not disagree either that Schedule G to the RPA limits the possibilities of reevaluation.").

assets was a legal or accounting question. Ultimately, Andersen balanced the parties' competing interests and made a finding as to the appropriate accounting policies to be applied, in spite of the fact that at the time Philips argued that such policies were legal and not accounting issues:

> As confirmed by Philips' and Whirlpool's transmittal letters to the signed engagement letter, we agreed not to address the potential legal implications of the non-existence of Schedule G (Argentina). Rather, as we agreed, we were to determine which accounting principles should have been applied considering all known circumstances, including the agreements and the signed amendments and schedule thereto. Indeed, this has been the basis on which we have rendered our conclusion in the draft Arbitrator's Report.
>
> We recognize that the effects from the revaluation restriction in the case of the Argentine transaction are relatively more significant in view of the three year period which had elapsed since the signature of the [RPA]. However, we understand that the delay in the transfer was caused by matters in Philips' interest and was not caused, nor desired by Whirlpool.
>
> In connection with this, Philips has admitted that there may have been an agreed intent that in general the revaluation of fixed assets was subject to a certain restraint, however that the mechanisms provided for by Schedule G could not be considered to be applicable. In response to this we have observed that Philips has never offered another reasonable alternative mechanism to restrict the revaluation of fixed assets.

Pl.'s Ex. D, Andersen letter of Mar. 24, 1993 at 2.

Additionally, it is persuasive to note that Andersen determined the appropriate accounting policies to be applied—in the absence of prior agreement of the parties—to the other matters at stake in the arbitration. *See, e.g.,* Andersen Draft Report at 8 (applying "generally accepted accounting principles" without explicit instruction); *id.* at 15 (rejecting Philips' Accounting Policies with respect to acquisition balance sheets based on original Schedule G and "Dutch authoritative literature"); *id.* at 19 (applying original Schedule G); Pl.'s Ex. D, Andersen Letter of March 24, 1993 at 4 (discussing meaning of Philips' Accounting Principles as applied consistently); *id.* at 5 (analyzing "United States accounting literature" to determine the accounting principles to be applied to adjustments 2, 4 and 5).

Therefore, Andersen appropriately found the question of fixed asset evaluation to be within its scope of authority, notwithstanding Philips' claim that there may be legal issues which remain unaddressed.

### D. Andersen Resolved the Issues Philips Seeks to Submit to ICC Arbitration on the Merits

As described in the facts and prior proceedings section above, Andersen conducted a thorough adversarial arbitral proceeding with eminently qualified experts of Philips' choosing. Contrary to Philips' newly-found assertion that it viewed the Andersen arbitration merely as a forum to resolve simple accounting quarrels, Philips had a full opportunity at the time, of which it took advantage, to raise its objections and advocate its position.

In the Arbitration, Andersen addressed Philips' contention that there was a dispute as to what the parties intended with they entered into the RPA and the Contribution Agreement. Andersen proceeded to determine that the original Schedule G was evidence of the parties' intent. Andersen stated that although it was clear that the parties had not anticipated applying the original Schedule G at the time of the Contribution Agreement, it was evident that the parties had "intended to give Whirlpool some control over the maximum amount of revaluations." Andersen Draft Report at 6. *See also Id.* at 7 ("the parties intended to agree that some revaluation restrictions should also apply.").

In addition, Andersen drew upon Philips' own language in communication that it intended to concede that the fixed asset revaluation would be limited. For example, in Philips' principal submission to Andersen on November 12, 1992, Philips conceded that the original Schedule G provides Whirlpool with "some kind of reasonable" protection. Pl.'s

Ex. J at 7. A few months later, on January 25, 1993, Philips " 'concedes that the Schedules of the RPA (including original Schedule G) apply to the contribution of the Argentine MDA, but disputes the manner in which they are applicable.' " Pl.'s Ex. M at 2. Again, in its final submission to Andersen on March 8, 1993, Philips stated that "Philips has also admitted that there may have been an agreed intent that in general, the revaluation of fixed assets was subject to certain restraint," and it "does not have any argument that in absence of an agreed Schedule G (Argentina) the corresponding schedule attached to the RPA [original Schedule G] should be taken into account." [8]  Pl.'s Ex. O at 2.

A final point, raised by Philips, is whether its assertion through letters that it reserved a right to appeal what it considered to be a legal question is valid in the face of its conduct and advocacy during the Andersen Arbitration. However, it is evident that the ICC does not have "appellate jurisdiction" over Andersen's final award. Furthermore, active and voluntary participation" in an arbitration proceeding must at some point limit a party's right to object to the arbitration. *See Gvozdenovic v. United Airlines, Inc.,* 933 F.2d 1100, 1105 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 305, 116 L.Ed.2d 248 (1991). In this case, Philips has reached that point of no return in which its active participation in what was known to be a final and binding arbitration has foreclosed its alleged rights of appeal.

### Conclusion

For the reasons set forth above, Whirlpool's motion to confirm the foreign arbitral award made by Andersen is granted. Philips' motion to dismiss or stay this action is hereby denied.

It is so ordered.

---

8.  Philips has made similar concessions in both its internal and external correspondence. On April 17, 1992, Dr. Van Voskuijlen, a Senior Staff member of Philips and one of the two lawyers responsible for the Philips/Whirlpool transaction wrote to Whirlpool that "[o]bviously, I would not dare to argue that the schedules belonging to the [RPA] are not applicable to the contribution of Argentina." Pl.'s Ex. L at 1.  More than a year later, on June 10, 1993, Dr. Voskuijlen again wrote "[i]n the absence of a Schedule G (Argentina) it is therefore appropriate to look at the provisions of Schedule G to the original RPA." Pl.'s Ex. N at 2.