**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: March 6, 2014          Decided: November 25, 2014)

Docket No. 13-1893-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CHESAPEAKE ENERGY CORPORATION,

       *Plaintiff-Appellee*,

v.

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,

       *Defendant-Appellant,*

AD HOC NOTEHOLDER GROUP,

       *Intervenor.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, CARNEY *Circuit Judges*, and FAILLA, *District Judge*.[*]

Defendant Bank of New York Mellon Trust Company, N.A. appeals from the judgment of the United States District Court for the Southern District of New York (Engelmayer, *J.*) declaring that the March 15, 2013 notice of redemption issued by Plaintiff Chesapeake Energy Corporation was timely and effective to redeem certain senior notes on May 15, 2013 at the Special Price of 100% of the principal amount, plus accrued and unpaid interest to the date of redemption. The Court of Appeals (Leval, *J.*) concludes that, under the unambiguous terms of the indenture, the notice was not timely to redeem the Notes at the Special Price, as such a redemption needed to be concluded no later than March 15, 2013, with 30 to 60 days prior notice. The judgment of the district court is therefore REVERSED and the case REMANDED with instructions to consider whether the notice operates as a notice of redemption under another provision of the indenture.

---

[*] The Honorable Katherine Polk Failla of the United States District Court for the Southern District of New York, sitting by designation.

Judge Failla dissents by separate opinion.

> ROY T. ENGLERT, JR. (Mark T. Stancil & Erin C. Blondel, *on the brief*), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, for *Defendant-Appellant*

> RICHARD F. ZIEGLER (Stephen L. Ascher, Ali M. Arain, Anne Cortina Perry & Michael W. Ross, *on the brief*), Jenner & Block LLP, New York, New York, for *Plaintiff-Appellee*

LEVAL, *Circuit Judge*:

Defendant Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") appeals from the judgment of the United States District Court for the Southern District of New York (Engelmayer, *J.*) declaring that the Notice of Special Early Redemption issued by plaintiff Chesapeake Energy Corporation ("Chesapeake") on March 15, 2013 was timely and effective to redeem certain senior notes (the "Notes") at the "Special Price" of 100% of the principal amount, plus interest accrued to the date of redemption. Joint App'x ("JA") at 730, *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, No. 13-1893 (Aug. 23, 2013). BNY Mellon brings this appeal in its capacity as indenture trustee for the benefit of the noteholders.

After an expedited bench trial, the district court adopted Chesapeake's argument, construing the Ninth Supplemental Indenture (the "Supplemental Indenture"), which governed the Notes, as unambiguously authorizing Chesapeake to redeem the Notes at the Special Price by giving notice of redemption during the Special Early Redemption Period—between November 15, 2012 and March 15, 2013—and redeeming the Notes 30 to 60 days thereafter. BNY Mellon contends that the Supplemental Indenture authorized Chesapeake to redeem the Notes at the Special Price only if the redemption would be accomplished within the Special Early Redemption Period, i.e., no later than March 15, 2013, with notice of 30 to 60 days given during the Special Early Redemption Period.

We agree with BNY Mellon. Accordingly, we reverse the judgment and remand for consideration of Chesapeake's second claim for declaratory relief.

## BACKGROUND

### a.     Factual Background

In February 2012, Chesapeake issued $1.3 billion in senior notes due on March 15, 2019 bearing an interest rate of 6.775%. The Notes were issued under two indentures—a pre-existing Base Indenture, dated August 2, 2010, which applied to several series of notes, and the Supplemental Indenture, dated February 16, 2012, which specifically governed this series. JA at 309, 726.

This dispute centers on the meaning of § 1.7 of the Supplemental Indenture, which governs Chesapeake's option to make a Special Early Redemption of the Notes. This section provides:

> (a) The Company [Chesapeake] shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

> (b) At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, *may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed*, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes remains outstanding. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 *so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period*. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

> (c) At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

JA at 730 (emphasis added).

Section 1.7(b) cross-references § 3.04 of the Base Indenture, which provides:

> (a) At least 30 days but not more than 60 days before a redemption date, [Chesapeake] shall mail a notice of redemption by first-class mail to each Holder of Securities to be redeemed at such Holder's registered address.

JA at 338.

These provisions allowed Chesapeake two elective options for early redemption. Pursuant to § 1.7(b), Chesapeake could elect early redemption of Notes at the Special Price during the Special Early Redemption Period. Pursuant to § 1.7(c), Chesapeake could elect early redemption of Notes after the Special Early Redemption Period at a substantially higher "Make-Whole Price."

On February 20, 2013, twenty-three days prior to the end of the Special Early Redemption Period, Chesapeake announced that it planned to redeem the Notes at the Special Price pursuant to § 1.7(b). Later that day, however, a hedge fund, which had purchased a large amount of the Notes, protested that the time allowed for notice of redemption at the Special Price had expired because redemption at the Special Price was permitted solely within the Special Early Redemption Period and no less than 30 days following the giving of notice, which was no longer possible.

On February 22, 2013, BNY Mellon notified Chesapeake that it would not participate in the proposed redemption. On February 28, 2013, BNY Mellon told Chesapeake that if Chesapeake issued a notice of redemption, BNY Mellon might deem the notice as having triggered redemption at the Make-Whole Price pursuant to § 1.7(c). Chesapeake nonetheless issued a Notice of Special Early Redemption on March 15, 2013, calling for redemption at the Special Price on May 15, 2013.

### b. The Trial and the District Court's Decision

On March 8, 2013, Chesapeake filed this action against BNY Mellon seeking declaratory judgment that its Notice of Special Early Redemption at the Special Price would be timely and

4

effective if mailed by March 15, 2013. In the event the court ruled that the notice was not timely to effectuate early redemption at the Special Price, the complaint also sought a declaratory ruling that the notice would not trigger redemption at the Make-Whole Price.

The court held an expedited bench trial on April 23-25, 2013 with closing arguments on April 30, 2013. On May 8, 2013, only eight days later, and with the date noticed for redemption only one week away, the court issued a detailed 92-page decision, and entered judgment thereon, ruling that § 1.7(b) of the Supplemental Indenture was unambiguous in setting March 15, 2013 as the deadline for notice of redemption at the Special Price, and in allowing actual redemption to occur 30 to 60 days thereafter. *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 957 F. Supp. 2d 316, 339-40 (S.D.N.Y. 2013). The court further ruled that, even if the indenture provisions were deemed ambiguous, "the extrinsic evidence convincingly establishes a meeting of the minds among the negotiating parties" that "these parties intended and agreed that March 15, 2013 would serve as the deadline for Chesapeake to give notice of redemption." *Id.* at 359.[1]

BNY Mellon appeals, arguing that § 1.7(b) authorized redemption at the Special Price only if accomplished no later than March 15, 2013, with notice given 30 to 60 days before, also during the Special Early Redemption Period.

**DISCUSSION**

We conclude that the terms of § 1.7 unambiguously terminated Chesapeake's right to redeem the Notes at the Special Price on March 15, 2013. Notice of such redemption needed to be given no later than February 13, 2013; the notice given by Chesapeake on March 15, 2013 of redemption to occur on May 15, 2013 was, therefore, untimely.

---

[1] The court also held that Chesapeake's notice was not defective, that Chesapeake's second claim for declaratory relief was moot in light of the court's holding, and that Chesapeake's claim was not barred by laches, equitable estoppel, or waiver. *Id.* at 372-74.

When interpreting a contract, our "primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "[T]he words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks omitted).

Under New York law, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* at 467 (internal quotation marks omitted). "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract . . . ." *Howard v. Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (citations omitted).

The district court adopted Chesapeake's argument. It read § 1.7(b)'s Special Early Redemption Period as fixing the period during which Chesapeake could begin the redemption process by providing notice, and not requiring actual redemption within that period. Accordingly, it read the term "may redeem," in the first sentence of § 1.7(b) to mean "may commence the redemption process [by giving notice]." *Chesapeake Energy Corp.*, 957 F. Supp. 2d at 336. In the

court's view, this interpretation was required in order to avoid what the court perceived to be an "irreconcilable conflict" in the indenture's terms. *Id.* at 337.

Because the first sentence of § 1.7(b) provides that Chesapeake "may redeem" the Notes at the Special Price "[a]t any time from and including November 15, 2012 to and including March 15, 2013," the court interpreted that sentence as guaranteeing Chesapeake four full months in which it could effectuate the redemption. However, the second sentence of § 1.7(b) (incorporating by reference § 3.04 of the Base Indenture) required Chesapeake to give 30 to 60 days notice, which notice was required to be given during the same four-month period. The notice obligation provided by the second sentence thus prevented Chesapeake from redeeming during the first 30 days of the specified Special Early Redemption Period. The effect of the second sentence was, thus, to allow three months during which Chesapeake could effectuate the redemption. In the court's view this created an irreconcilable conflict. *Id.* The court explained,

> Under BNY Mellon's reading of § 1.7(b), there is no four-month period for doing *anything*, including for giving notice or for a redemption. Rather, there is, implicitly, a three-month period for a notice of at-par redemption (November 15, 2012 through February 13, 2013) and a separate, implicit three-month period for redemption itself on such terms (December 15, 2012 through March 15, 2013) . . . .

*Id.* at 338.

While the court's observation (that Chesapeake did not have four months in which it could redeem) was correct, we respectfully disagree that this created an irreconcilable conflict. Chesapeake's interpretation is flawed in several respects.

The Supplemental Indenture does not purport to give Chesapeake four months in which to accomplish redemption at the Special Price, or four months in which to give notice of the redemption. Nor does the indenture purport to give Chesapeake the opportunity to redeem *at any*

*time* between November 15, 2012 and March 15, 2013. The indenture was simply drafted using a "so long as" clause, in the nature of a proviso, which limited the scope of a prior provision.

It is true that the first sentence of § 1.7(b) of the Supplemental Indenture, if it were written in isolation, would give Chesapeake the right to redeem Notes at the Special Price "at any time from and including November 15, 2012 to and including March 15, 2013," defined as the "Special Early Redemption Period." But that first sentence does not appear in isolation. The immediately following sentence makes clear that Chesapeake's right of redemption set forth in the first sentence is subjected to a limiting qualification. The second sentence states, "[Chesapeake] shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 *so long as it gives the notice* of redemption pursuant to Section 3.04 of the Base Indenture *during the Special Early Redemption Period*." JA at 730 (emphasis added).

Reading the first and second sentences together makes clear that Chesapeake may exercise this right of early redemption only during the Special Early Redemption Period and only after giving the required notice of 30 to 60 days "*during the Special Early Redemption Period*." JA at 730 (emphasis added).

When a proposition is followed by a clause beginning with "so long as," the "so long as" clause typically serves as a proviso, introducing a condition that narrows the broader initial proposition. *See, e.g.*, *Burrage v. United States*, 571 U.S. __, 134 S.Ct. 881, 888 (2014) ("[I]f poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived."); *The Chicago Manual of Style* § 4.3 (16th ed. 2010) ("Whenever a book or article, poem or lecture, database or drama comes into the world, it is automatically covered by copyright so long as it is 'fixed' in some 'tangible' form and embodies original

8

expression."). Section 1.7(b)'s "so long as" clause is not in conflict with the first sentence; it is a proviso, which limits the scope of Chesapeake's right.

The use of such a proviso in a contract can indeed narrow the scope of a contract term, but it does so in a manner dictated by the contractual text. As employed in the Supplemental Indenture, this common linguistic device was used to set forth the different components of a set of rights and obligations in separate sentences. The contractual text required reading these different sentences in tandem. When read in tandem, these sentences communicated a clearly defined right, contingent on the performance of clearly specified obligations.

If instead of describing the Special Early Redemption process in two consecutive sentences, the indenture had stated in a single sentence, "At any time during the Special Early Redemption Period from November 15, 2012 to March 15, 2013, Chesapeake may redeem the Notes at the Special Price, so long as it gives notice pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period," what Chesapeake calls an "irreconcilable conflict" would be equally present, and yet no one could fail to understand that both notice and redemption must occur during the Special Early Redemption Period. By spreading those provisions through two successive sentences, the indenture perhaps required more patience on the part of the reader, but it had the same unmistakable meaning.

A further flaw in Chesapeake's interpretation is that it introduces conflict and contradiction into the contractual text. This interpretation construes the words "may redeem" in the first sentence of § 1.7(b) to mean "may commence the redemption process [by giving notice]." *Chesapeake Energy Corp.*, 957 F. Supp. 2d at 336. It attributes to the word "redeem" an unnatural meaning, substantially different from its normal meaning. Additionally, it causes the word to carry different

9

meanings in different iterations within the same contractual provision, indeed within the same sentence.

"Redeem" (in the verb form) or "redemption" (in its noun form) refers to "[t]he reacquisition of a security by the issuer." *Black's Law Dictionary* 1390 (9th ed. 2009) (defining "redemption" as "[t]he reacquisition of a security by the issuer"); *Barron's Dictionary of Finance and Investment Terms* 587 (8th ed. 2010) (defining "redemption" as "repayment of a debt security or preferred stock issue, at or before maturity"); *Webster's New International Dictionary* 2085 (2d ed. 1934) (defining "redeem" as "[t]o regain possession of by payment of a stipulated price; to repurchase"). Chesapeake's interpretation gives the term a very different meaning—not "[t]he reacquisition of a security by the issuer," but the giving of notice by the issuer that it would reacquire the security.

Furthermore, Chesapeake's interpretation causes the term to mean different things in different instances of its appearance. "Redeem" (or "redemption") appears numerous times in § 1.7, and six times within the affected first sentence of § 1.7(b). For the first and second appearances of the term in that sentence—"Special Early *Redemption* Period" and "[Chesapeake], at its option may *redeem* the Notes"—Chesapeake's interpretation changes its meaning so that instead of referring to the act of redemption, it refers to the giving of notice of a future redemption. For this sentence to make sense, however, "redeem" needs to retain its normal meaning in other appearances within the sentence. Unpaid interest to "the date of *redemption*" cannot reasonably refer to the date of the notice. It necessarily refers to the date on which Chesapeake pays the debt represented by the Notes (or otherwise reacquires them), as interest would continue to accrue so long as any part of the debt remains outstanding. Likewise, it is clear that in requiring that $250 million aggregate principal remain outstanding "immediately following any *redemption*," the sentence refers to actual

redemption, not the date the redemption is noticed. The word "redemption" in the phrase "notice of redemption," which appears in the second sentence, necessarily refers to the reacquisition of the Notes and not the giving of notice. Finally, there would be no making sense of the provision requiring that notice be mailed to noteholders "[a]t least 30 days but not more than 60 days before a *redemption* date," JA at 338, unless "redemption" carries its customary meaning. Under Chesapeake's interpretation of the Supplemental Indenture, the indenture trustee, charged with the fiduciary duty to protect the rights of the noteholders, would be left to guess when the contractual term meant what it said, and when a different, artificial meaning was to be substituted.[2]

The terms of the Supplemental Indenture had a definite and precise meaning. The contract made perfect sense with the term "redeem" carrying its normal meaning in each usage. The governing indenture unambiguously provided that, in order to exercise the right to early redemption

---

[2] Judge Failla argues that our reading of the indenture is defective because it renders untrue the statement implicit in the first sentence of § 1.7(b) that Chesapeake *may redeem the Notes* between November 15 and December 14 at the Special Price. Under our reading, she contends, the term "Special Early Redemption Period" of November 15, 2012 to March 15, 2013 "would cease to have independent meaning." We respectfully disagree with both propositions. As Judge Failla earlier acknowledges, the term Special Early Redemption Period continues to have meaning under our reading. It is the period during which Chesapeake must do all actions necessary under the contract to effectuate redemption at the Special Price: the giving of notice and the redemption. And while it is correct that, if the first sentence of § 1.7(b) were to be read in isolation, its statement that Chesapeake "may redeem the Notes" at any time from November 15, 2012 to March 15, 2013, would prove untrue as to the first 30 days of the period, the first sentence is not to be read in isolation. It is immediately qualified by the next sentence, which explains that Chesapeake may "exercise its option to redeem the Notes . . . *so long as* it gives the notice of redemption . . . *during the Special Early Redemption Period.*" As is commonplace, the proviso limits the scope of the statement to which it serves as a proviso.

Judge Failla further asserts that our reading is structurally incoherent and elevates form over substance. We do not see how that is the case. Our reading simply reads the word "redeem" to mean what it says. When the word is read to retain its meaning in each of its appearances, the provisions of § 1.7(b), although set forth in a complicated structure, have a clear, coherent, and understandable meaning.

11

at the Special Price, Chesapeake was obliged, as the indenture trustee has correctly insisted, to effectuate the redemption within the specified Special Early Redemption Period upon notice of 30 to 60 days also given within that period. Chesapeake's option to make Special Early Redemption at the Special Price could therefore be exercised only by effectuating redemption no later than March 15, 2013, upon notice given no later than February 13, 2013. The notice Chesapeake gave on March 15, 2013, calling for redemption on May 15, 2013, was untimely and ineffective to redeem at the Special Price.[3]

**CONCLUSION**

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for consideration of Chesapeake's second claim for declaratory judgment that the redemption notice given by Chesapeake on March 15, 2013 should not be deemed to have noticed redemption at the Make-Whole Price.

---

[3] Because we find that the Supplemental Indenture is unambiguous, we have no need to rule on the district court's findings relating to extrinsic evidence. *See Howard*, 740 N.Y.S.2d at 71.

FAILLA, *District Judge*, dissenting:

Both the district court and the majority have it half-right: the majority is correct that Section 1.7(b) of the Supplemental Indenture cannot be read to unambiguously support Chesapeake's position, and the district court is correct that it cannot be read to unambiguously support BNY Mellon's position. The text is ambiguous, and the case should be remanded to the district court to reevaluate the extrinsic evidence with due regard for the principles of unmanifested subjective intent and course of performance discussed below. In evaluating the extrinsic evidence in the alternative, the district court should have accorded less weight to the negotiations between Chesapeake and its underwriter, and more weight to Chesapeake's post-drafting statements. Accordingly, I respectfully dissent.

## DISCUSSION

### a. The Text Is Ambiguous

The conflict between the first and second sentences of Section 1.7(b) is not susceptible to any single unambiguous resolution. "Contract language is unambiguous when it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). "Ambiguous language is language that is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Ambiguity is a question of law, and thus a district court's decision as to whether a contract is

1

ambiguous is reviewed *de novo*. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009). While ambiguity is not found by counting noses, the simple fact that the judges of the court below and the majority—all, it can safely be said, "reasonably intelligent person[s]"—have arrived at opposite conclusions as to the meaning of the language suggests the presence of ambiguity.

Two principles of interpretation push against the majority's reading of the text. First, "court[s] should read the integrated contract 'as a whole to ensure that undue emphasis is not placed upon particular words and phrases,' and 'to safeguard against adopting an interpretation that would render any individual provision superfluous.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 459, 468 (2d Cir. 2010) (quoting *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002)). This principle cautions against a reading of the second sentence of Section 1.7(b) of the Supplemental Indenture as simply excising the November 15-December 14 period from the "Special Early Redemption Period" identified in the first sentence. Admittedly, this is not a prototypical application of the canon against surplusage: in the majority's reading of the text both sentences continue to have meaning, and the "Special Early Redemption Period" continues to have some effect in defining the limits of both notice and redemption. Yet insofar as the first sentence of Section 1.7(b) says, in part, that Chesapeake may redeem the Notes between November 15 and December 14, that portion has become entirely untrue under the majority's reading. The complete nullification of this portion distinguishes Section 1.7(b) from the examples of provisos offered by the majority, *see supra* at 8-9, where *all* portions of the sets identified in the first clause can be true under certain circumstances, so long as they meet the requirements of the proviso. Here, under the majority's reading, it is rendered misleading and

2

unnecessary for the Supplemental Indenture ever to have identified November 15 to December 14 as part of the period in which Chesapeake could redeem the Notes.

Second, for largely the same reasons just identified, the reading offered by BNY Mellon and adopted by the majority is structurally incoherent, even if it does follow the precise wording of Section 1.7(b).[1] New York courts have repeatedly emphasized that "[f]orm should not prevail over substance and a sensible meaning of words should be sought." *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998) (quoting *William C. Atwater & Co. v. Pan. R.R. Co.*, 246 N.Y. 519, 524 (N.Y. 1927)). As the district court points out, under BNY Mellon's reading the "Special Early Redemption Period" not only ceases to be a "redemption period," it ceases to be any meaningful period at all. *See Chesapeake Energy Corp.*, 957 F. Supp. 2d at 338-39. The period in which the Notes can be redeemed would span December 15, 2012, to March 15, 2013, while the period in which notice must be given would span from November 15, 2012, to February 13, 2013; the "Special Early Redemption Period" of November 15, 2012, to March 15, 2013, would cease to have independent meaning. Even if this is the result suggested by a literal reading of the text, under New York law it cannot be stated that such a bizarre outcome is unambiguously that intended by the parties.

The district court, recognizing the implausible result reached by a strictly literal reading of the text, arrived at an interpretation that restores coherence to the contested clause: the phrase "may redeem" in the first sentence of Section 1.7(b) becomes "may give notice of redemption," and the "Special Early Redemption Period" becomes a single, four-month period in which Chesapeake may give notice of redemption. *See Chesapeake Energy Corp.*, 957 F. Supp. 2d at 335-36. Nevertheless, as found by the majority, the interpretation proffered by the district court

---

[1] While I agree that the Section 1.7(b) *could* have been written as a single, structurally coherent sentence, I do not believe that the sentence offered by the majority faithfully represents Section 1.7(b). *See supra* at 9.

3

is a bridge too far. The district court's reading would require the word "redeem" to take on multiple meanings within the Indentures, within Section 1.7(b), and even within the same sentence. While, as the district court notes, unusual constructions of a term can prevail where reasonable interpretation of the contract so requires, *id.* at 335-37, this principle does not extend so far as to allow two distinct constructions of a single term to coexist within the same contractual clause. *Cf. Md. Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997), *as amended* (Nov. 18, 1997) ("Terms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended.").

Despite very thoughtful efforts by both the majority and the district court, the first and second sentences of Section 1.7(b) cannot be reconciled. Where two contractual clauses conflict, the Second Circuit has found ambiguity where there is not a compelling reason to favor one over the other. *See Seiden Assocs.*, 959 F.2d at 429-30 ("We see two possible readings—each of which denigrates the plain meaning of the other . . . . In sum, because the interrelationship of the two provisions in the letter agreement is susceptible to several reasonable interpretations, the contract is ambiguous. It cannot be definitely and precisely gleaned which reading was intended by the parties."); *cf. Collins v. Harrison-Bode*, 303 F.3d 429, 434 (2d Cir. 2002) ("The impossibility of sensibly reconciling the usage of the term 'Monet' throughout the contract with the definition set forth in the release clause leads to our conclusion that the Settlement Agreement is ambiguous.").[2] Section 1.7(b) is therefore ambiguous due to the conflict between

---

[2] While "it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language,'" *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting *Restatement (Second) of Contracts* § 203(c) (1981)), I do not agree with the district court that the second sentence of the clause is more specific than the first, *see Chesapeake Energy Corp.*, 957 F. Supp. 2d at 336. This canon of interpretation is usually applied not to distinguish between consecutive sentences, as here, but to distinguish between vague clauses indicating contractual purposes and specific clauses indicating concrete obligations. *See, e.g.*, *Aramony*, 254 F.3d at 414.

4

the two sentences, and the case should be remanded for reconsideration of the extrinsic evidence. *See FLLI Moretti Cereali S.p.A. v. Cont'l Grain Co.*, 563 F.2d 563, 566 (2d Cir. 1977) (finding that where a contract shows inconsistency between two provisions, "[t]he parties have a right to present extrinsic evidence to aid in interpreting the assignment" (citing, *inter alia*, *Hotel Credit Card Corp. v. Am. Express Co.*, 13 A.D.2d 189, 193 (1st Dep't 1961) ("The discernible purpose of an agreement and the circumstances surrounding its execution may properly serve as a guide to resolving apparent contradictions and defining obligations imperfectly expressed."))).

### b. The Lower Court Should Reevaluate the Extrinsic Evidence

While the district court has already evaluated the extrinsic evidence as part of its finding in the alternative, it did not accord proper weight to certain aspects of that evidence. Specifically, the district court placed undue weight on testimony from and correspondence between the persons who drafted Section 1.7(b), *see Chesapeake Energy Corp.*, 957 F. Supp. 2d at 354-59, and too easily discounted the statements made by officers of Chesapeake who did not personally participate in the drafting, *see id.* at 359-70. In doing so, the district court concluded that the extrinsic evidence supported Chesapeake's interpretation that Section 1.7(b) allowed Chesapeake to give notice of redemption up to March 15, 2013, and to redeem up to 60 days after giving notice. *Id.* at 370. This conclusion should be reevaluated to ascribe less weight to subjective intent and more weight to what was successfully communicated to the purchasers of the bonds.

The common subjective understanding of an issuer and an underwriter, when uncommunicated to bondholders or an indenture trustee, should be ascribed minimal weight when evaluating extrinsic evidence. This doctrine of "unmanifested subjective intent" is not merely concerned with collusion or post hoc rationalization, but with the knowledge of the party to whom the subjective intent is not overtly communicated. *See Hotchkiss v. Nat'l City Bank of*

5

*N.Y.*, 200 F. 287, 294 (S.D.N.Y. 1911) (Hand, J.) ("Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effect by either party thereafter, *however truthful*, is material." (emphasis added)), *aff'd sub nom. Ernst v. Mechs.' & Metals Nat'l Bank of N.Y.C.*, 201 F. 664 (2d Cir. 1912); *cf. Webster v. N.Y. Life Ins. & Annuity Corp.*, 386 F. Supp. 2d 438, 442 n.2 (S.D.N.Y. 2005) ("It is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls." (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 31:4 (4th ed. 1993 & Supp. 1999) (hereinafter "*Williston on Contracts*"))). Because the parties to this contract are the issuer and the indenture trustee, negotiations between the issuer and the underwriter—no matter how arm's-length or contentious—cannot be used to impose an interpretation on the indenture trustee of which it was not aware. *Cf. Zell v. Am. Seating Co.*, 138 F.2d 641, 646 (2d Cir. 1943) (stating that courts consider "only those manifestations of intention which are public ('open to the scrutiny and knowledge of the community') and not private" (footnote omitted)), *rev'd on other grounds*, 322 U.S. 709 (1944). While such communications are admissible and can provide some aid in interpreting the objective actions of a party, they are not to be accorded decisive weight in interpreting ambiguous contractual language. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 126 (2d Cir. 2006) ("[W]ith respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions."). Accordingly, the understanding arrived at by the four people who drafted Section 1.7(b)—consisting of Chesapeake's chief financial officer and executive vice president; a partner at Bracewell & Giuliani, Chesapeake's outside counsel; a managing director at Bank of America Merrill Lynch, Pierce, Fenner & Smith

Inc., Chesapeake's underwriter; and a partner at Cravath, Swain & Moore, underwriter's counsel, *see Chesapeake Energy Corp.*, 957 F. Supp. 2d at 346-47—cannot, standing alone, control the meaning of Section 1.7(b). The district court should not have rested its analysis of the extrinsic evidence on this common understanding without a closer inquiry into the awareness of BNY Mellon and the bondholders.

Meanwhile, the district court should have given more weight to the statements made by Chesapeake and its officers after the contract's formation. The district court concluded that such statements were irrelevant, as only *conduct* could demonstrate Chesapeake's understanding of March 15, 2013, as the final deadline for redemption. *Chesapeake Energy Corp.*, 957 F. Supp. 2d at 366. Yet evidence of the "course of performance," as it is sometimes labeled, is not limited to actions, but encompasses statements as well. *See* 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.16 (Joseph M. Perillo ed., rev. ed. 1998) ("In the process of interpreting a contract, the court can receive great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or in receiving performance under it. The practical interpretation of a contract may thus be evidenced by the parties' acts or by their words."); 11 *Williston on Contracts* § 32:14 ("Once it is determined in a particular jurisdiction that the underlying requirements have been met so as to permit evidence of the parties' conduct, their own interpretation may be shown by acts of the parties as well as precise words." (internal quotation marks omitted)). Courts in this Circuit have followed this rule, looking to post-drafting statements as well as actions of parties to a contract in interpreting ambiguous provisions. *See Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90 (2d Cir. 1984) (looking to "a series of memoranda and correspondence exchanged" after the drafting of the contract, and stating that "the doctrine of practical construction is ordinarily limited to the acts

7

*and statements* of the contracting parties" (emphasis added)); *Pressed Steel Car Co. v. Union Pac. R. Co.*, 297 F. 788, 790 (2d Cir. 1924) ("[I]nterpretation may be given to a contract by the acts and/or declarations of the parties, done or made while the agreement is in process of fulfillment, and before any differences have arisen between them."); *Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 82-83 (S.D.N.Y. 1992) (looking to the post-drafting statements of a corporate officer, and finding "these statements reflecting the parties' practical interpretation of the contract to be highly probative of the intended meaning").

Moreover, courts do not confine this inquiry to the statements of those personally involved in drafting a contested contractual provision, but look more broadly to statements that can be attributed to a party to the contract. *See Ocean Transp. Line*, 743 F.2d at 91 (looking to correspondence among corporate officers without any discussion of their personal participation in drafting); *Gestetner Holdings*, 784 F. Supp. at 83 (attributing to the defendant corporation the statements of its "vice-president of finance and chief financial officer," with no indication that he had personally participated in drafting the arbitration clause at issue); *Mobil Oil Corp. v. Fraser*, 55 A.D.2d 824, 825 (1st Dep't 1976) ("[T]he initial concurrence by Mobil's agents in defendants' interpretation of the now contested paragraph reflects the interpretation that the parties themselves placed on the agreement subsequent to its formation."). BNY Mellon and the bondholders were entitled to rely on the statements made by Chesapeake's officers without inquiring into their personal knowledge of the negotiations, and the district court should accordingly factor these statements into its evaluation of the extrinsic evidence.[3]

---

[3] As the district court recognized, *see Chesapeake Energy Corp.*, 957 F. Supp. 2d at 332, if the meaning of Section 1.7 could not be ascertained even after consideration of extrinsic evidence, the court could apply the doctrine of *contra proferentem*.

**CONCLUSION**

Section 1.7(b)'s two sentences are facially in tension: Chesapeake's reading requires the word "redeem" to take on shifting meanings, and BNY Mellon's attempt to harmonize them by making the latter a proviso to the former does excessive violence to the structural integrity of the clause, and in particular the nature of the "Special Early Redemption Period." The text of the Indentures is thus ambiguous. The extrinsic evidence, however, is not as universally favorable to Chesapeake as the district court indicated. Faithful application of the doctrine of unmanifested intent requires allocating little persuasive weight to the negotiations between Chesapeake and BAML, while a more complete view of course of performance evidence lends significant support to BNY Mellon. Accordingly, this case should be remanded for reevaluation of the extrinsic evidence.