FAILLA, District Judge,
dissenting:
Both the district court and the majority have it half-right: the majority is correct that Section 1.7(b) of the Supplemental Indenture cannot be read to unambiguously support Chesapeake’s position, and the district court is correct that it cannot be read to unambiguously support BNY Mellon’s position. The text is ambiguous, and the case should be remanded to the district court to reevaluate the extrinsic evidence with due regard for the principles of unmanifested subjective intent and course of performance discussed below. In evaluating the extrinsic evidence in the alternative, the district court should have accord *118 ed less weight to the negotiations between Chesapeake and its underwriter, and more weight to Chesapeake’s post-drafting statements. Accordingly, I respectfully dissent.
DISCUSSION
a. The Text Is Ambiguous
The conflict between the first and second sentences of Section 1.7(b) is not susceptible to any single unambiguous resolution. Contract language is unambiguous when it has ‘a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.’ Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir.2000) (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989)). “Ambiguous language is language that is ‘capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.’ ” Id. (quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992)). Ambiguity is a question of law, and thus a district court’s decision as to whether a contract is ambiguous is reviewed de novo. JA Apparel Corp. v. Abboud, 568 F.3d 390, 396-97 (2d Cir.2009). While ambiguity is not found by counting noses, the simple fact that the judges of the court below and the majority — all, it can safely be said, “reasonably intelligent person[s]” — have arrived at opposite conclusions as to the meaning of the language suggests the presence of ambiguity.
Two principles of interpretation push against the majority’s reading of the text. First, courtfs] should read the integrated contract ‘as a whole to ensure that undue emphasis is not placed upon particular words and phrases,’ and ‘to safeguard against adopting an interpretation that would render any individual provision superfluous.’ Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir.2010) (quoting Bailey v. Fish & Neave, 8 N.Y.3d 523, 528, 837 N.Y.S.2d 600, 868 N.E.2d 956 (2007); Int’l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2d Cir.2002)). This principle cautions against a reading of the second sentence of Section 1.7(b) of the Supplemental Indenture as simply excising the November 15-December 14 period from the “Special Early Redemption Period” identified in the first sentence. Admittedly, this is not a prototypical application of the canon against surplusage: in the majority’s reading of the text both sentences continue to have meaning, and the “Special Early Redemption Period” continues to have some effect in defining the limits of both notice and redemption. Yet insofar as the first sentence of Section 1.7(b) says, in part, that Chesapeake may redeem the Notes between November 15 and December 14, that portion has become entirely untrue under the majority’s reading. The complete nullification of this portion distinguishes Section 1.7(b) from the examples of provisos offered by the majority, see supra at 115-16, where all portions of the sets identified in the first clause can be true under certain circumstances, so long as they meet the requirements of the proviso. Here, under the majority’s reading, it is rendered misleading and unnecessary for the Supplemental Indenture ever to have identified November 15 to December 14 as part of the period in which Chesapeake could redeem the Notes.
Second, for largely the same reasons just identified, the reading offered by BNY *119 Mellon and adopted by the majority is structurally incoherent, even if it does follow the precise wording of Section 1.7(b).[1] New York courts have repeatedly emphasized that “[fjorm should not prevail over substance and a sensible meaning of words should be sought.” Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (N.Y.1998) (quoting William C. Atwater & Co. v. Pan. R.R. Co., 246 N.Y. 519, 524, 159 N.E. 418 (N.Y.1927)). As the district court points out, under BNY Mellon’s reading the “Special Early Redemption Period” not only ceases to be a “redemption period,” it ceases to be any meaningful period at all. See Chesapeake Energy Corp., 957 F.Supp.2d at 338-39. The period in which the Notes can be redeemed would span December 15, 2012, to March 15, 2013, while the period in which notice must be given would span from November 15, 2012, to February 13, 2013; the “Special Early Redemption Period” of November 15, 2012, to March 15, 2013, would cease to have independent meaning. Even if this is the result suggested by a literal reading of the text, under New York law it cannot be stated that such a bizarre outcome is unambiguously that intended by the parties.
The district court, recognizing the implausible result reached by a strictly literal reading of the text, arrived at an interpretation that restores coherence to the contested clause: the phrase “may redeem” in the first sentence of Section 1.7(b) becomes “may give notice of redemption,” and the “Special Early Redemption Period” becomes a single, four-month period in which Chesapeake may give notice of redemption. See Chesapeake Energy Corp., 957 F.Supp.2d at 335-36. Nevertheless, as found by the majority, the interpretation proffered by the district court is a bridge too far. The district court’s reading would require the word “redeem” to take on multiple meanings within the Indentures, within Section 1.7(b), and even within the same sentence. While, as the district court notes, unusual constructions of a term can prevail where reasonable interpretation of the contract so requires, id. at 335-37, this principle does not extend so far as to allow two distinct constructions of a single term to coexist within the same contractual clause. Cf. Md. Cas. Co. v. W.R. Grace & Co., 128 F.3d 794, 799 (2d Cir.1997), as amended (Nov. 18, 1997) (“Terms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended.”).
Despite very thoughtful efforts by both the majority and the district court, the first and second sentences of Section 1.7(b) cannot be reconciled. Where two contractual clauses conflict, the Second Circuit has found ambiguity where there is not a compelling reason to favor one over the other. See Seiden Assocs., 959 F.2d at 429-30 (“We see two possible readings-each of which denigrates the plain meaning of the other----In sum, because the interrelationship of the two provisions in the letter agreement is susceptible to several reasonable interpretations, the contract is ambiguous. It cannot be definitely and precisely gleaned which reading was intended by the parties.”); cf. Collins v. Harrison-Bode, 303 F.3d 429, 434 (2d Cir.2002) (“The impossibility of sensibly reconciling the usage of the term ‘Monet’ throughout the contract with the definition set forth in the release clause leads to our conclusion that the Settlement Agreement *120 is ambiguous.”).[2] Section 1.7(b) is therefore ambiguous due to the conflict between •the two sentences, and the case should be remanded for reconsideration of the extrinsic evidence. See FLLI Moretti Cereali S.p.A. v. Cont’l Grain Co., 563 F.2d 563, 566 (2d Cir.1977) (finding that where a contract shows inconsistency between two provisions, “[t]he parties have a right to present extrinsic evidence to aid in interpreting the assignment” (citing, inter alia. Hotel Credit Card Corp. v. Am. Express Co., 13 A.D.2d 189, 193, 214 N.Y.S.2d 921 (1st Dep’t 1961) (“The discernible purpose of an agreement and the circumstances surrounding its execution may properly serve as a guide to resolving apparent contradictions and defining obligations imperfectly expressed.”))).
b. The Lower Court Should Reevaluate the Extrinsic Evidence
While the district court has already evaluated the extrinsic evidence as part of its finding in the alternative, it did not accord proper weight to certain aspects of that evidence. Specifically, the district court placed undue weight on testimony from and correspondence between the persons who drafted Section 1.7(b), see Chesapeake Energy Corp., 957 F.Supp.2d at 354-59, and too easily discounted the statements made by officers of Chesapeake who did not personally participate in the drafting, see id. at 359-70. In doing so, the district court concluded that the extrinsic evidence supported Chesapeake’s interpretation that Section 1.7(b) allowed Chesapeake to give notice of redemption up to March 15, 2013, and to redeem up to 60 days after giving notice. Id. at 370. This conclusion should be reevaluated to ascribe less weight to subjective intent and more weight to what was successfully communicated to the purchasers of the bonds.
The common subjective understanding of an issuer and an underwriter, when uncommunicated to bondholders or an indenture trustee, should be ascribed minimal weight when evaluating extrinsic evidence. This doctrine of “unmanifested subjective intent” is not merely concerned with collusion or post hoc rationalization, but with the knowledge of the party to whom the subjective intent is not overtly communicated. See Hotchkiss v. Nat’l City Bank of N.Y., 200 F. 287, 294 (S.D.N.Y.1911) (Hand, J.) (“Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effect by either party thereafter, however truthful, is material.” (emphasis added)), affd sub nom. Ernst v. Mechs.’ & Metals Nat’l Bank of N.Y.C., 201 F. 664 (2d Cir.1912); cf. Webster v. N.Y. Life Ins. & Annuity Corp., 386 F.Supp.2d 438, 442 n. 2 (S.D.N.Y.2005) (“It is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls.” (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 31:4 (4th ed. 1993 & Supp.1999) (hereinafter “Williston on Contracts ”))). Because the parties to this contract are the issuer and *121 the indenture trustee, negotiations between the issuer and the underwriter- — no matter how arm’s-length or contentious— cannot be used to impose an interpretation on the indenture trustee of which it was not aware. Cf. Zell v. Am. Seating Co., 138 F.2d 641, 646 (2d Cir.1943) (stating that courts consider “only those manifestations of intention which are public (‘open to the scrutiny and knowledge of the community’) and not private” (footnote omitted)), rev’d on other grounds, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552 (1944). While such communications are admissible and can provide some aid in interpreting the objective actions of a party, they are not to be accorded decisive weight in interpreting ambiguous contractual language. See SR Int’l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 126 (2d Cir.2006) (“[Wjith respect to a negotiated agreement, a party’s subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party’s objective actions.”). Accordingly, the understanding arrived at by the four people who drafted Section 1.7(b) — consisting of Chesapeake’s chief financial officer and executive vice president; a partner at Bracewell & Giuliani, Chesapeake’s outside counsel; a managing director at Bank of America Merrill Lynch, Pierce, Fenner & Smith Inc., Chesapeake’s underwriter; and a partner at Cravath, Swain & Moore, underwriter’s counsel, see Chesapeake Energy Corp., 957 F.Supp.2d at 346-47 — cannot, standing alone, control the meaning of Section 1.7(b). The district court should not have rested its analysis of the extrinsic evidence on this common understanding without a closer inquiry into the awareness of BNY Mellon and the bondholders.
Meanwhile, the district court should have given more weight to .the statements made by Chesapeake and its officers after the contract’s formation. The district court concluded that such statements were irrelevant, as only conduct could demonstrate Chesapeake’s understanding of March 15, 2013, as the final deadline for redemption. Chesapeake Energy Corp., 957 F.Supp.2d at 366. Yet evidence of the “course of performance,” as it is sometimes labeled, is not limited to actions, but encompasses statements as well. See 5 Margaret N. Kniffin, Corbin on Contracts § 24.16 (Joseph M. Perillo ed., rev. ed. 1998) (“In the process of interpreting a contract, the court can receive great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or in receiving performance under it. The practical interpretation of a contract may thus be evidenced by the parties’ acts or by their words.”); 11 Williston on Contracts § 32:14 (“Once it is determined in a particular jurisdiction that the underlying requirements have been met so as to permit evidence of the parties’ conduct, their own interpretation may be shown by acts of the parties as well as precise words.” (internal quotation marks omitted)). Courts in this Circuit have followed this rule, looking to post-drafting statements as well as actions of parties to a contract in interpreting ambiguous provisions. See Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc., 743 F.2d 85, 90 (2d Cir.1984) (looking to “a series of memoranda and correspondence exchanged” after the drafting of the contract, and stating that “the doctrine of practical construction is ordinarily limited to the acts and statements of the contracting parties” (emphasis added)); Pressed Steel Car Co. v. Union Pac. R. Co., 297 F.788, 790 (2d Cir.1924) (“[Interpretation may be given to a contract by the acts and/or declarations of the parties, done or made while the agreement is in process of fulfillment, and before any differences have arisen between them.”); Gestetner *122 Holdings, PLC v. Nashua Corp., 784 F.Supp. 78, 82-83 (S.D.N.Y.1992) (looking to the post-drafting statements of a corporate officer, and finding “these statements reflecting the parties’ practical interpretation of the contract to be highly probative of the intended meaning”).
Moreover, courts do not confine this inquiry to the statements of those personally involved in drafting a contested contractual provision, but look more broadly to statements that can be attributed to a party to the contract. See Ocean Transp. Line, 743 F.2d at 91 (looking to correspondence among corporate officers without any discussion of their personal participation in drafting); Gestetner Holdings, 784 F.Supp. at 83 (attributing to the defendant corporation the statements of its “vice-president of finance and chief financial officer,” with no indication that he had personally participated in drafting the arbitration clause at issue); Mobil Oil Corp. v. Fraser, 55 A.D.2d 824, 825, 389 N.Y.S.2d 954 (4th Dep’t 1976) (“[T]he initial concurrence by Mobil’s agents in defendants’ interpretation of the now contested paragraph reflects the interpretation that the parties themselves placed on the agreement subsequent to its formation.”). BNY Mellon and the bondholders were entitled to rely on the statements made by Chesapeake’s officers without inquiring into their personal knowledge of the negotiations, and the district court should accordingly factor these statements into its evaluation of the extrinsic evidence.[3]
CONCLUSION
Section 1.7(b)’s two sentences are facially in tension: Chesapeake’s reading requires the word “redeem” to take on shifting meanings, and BNY Mellon’s attempt to harmonize them by making the latter a proviso to the former does excessive violence to the structural integrity of the clause, and in particular the nature of the “Special Early Redemption Period.” The text of the Indentures is thus ambiguous. The extrinsic evidence, however, is not as universally favorable to Chesapeake as the district court indicated. Faithful application of the doctrine of unmanifested intent requires allocating little persuasive weight to the negotiations between Chesapeake and BAML, while a more complete view of course of performance evidence lends significant support to BNY Mellon. Accordingly, this case should be remanded for reevaluation of the extrinsic evidence.

. While I agree that the Section 1.7(b) could have been written as a single, structurally coherent sentence, I do not believe that the sentence offered by the majority faithfully represents Section 1.7(b). See supra at 116.

. While "it is a fundamental rule of contract construction that ‘specific terms and exact terms are given greater weight than general language,’ ” Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir.2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)), I do not agree with the district court that the second sentence of the clause is more specific than the first, see Chesapeake Energy Corp., 957 F.Supp.2d at 336. This canon of interpretation is usually applied not to distinguish between consecutive sentences, as here, but to distinguish between vague clauses indicating contractual purposes and specific clauses indicating' concrete obligations. See, e.g., Aramony, 254 F.3d at 414.

. As the district court recognized, see Chesapeake Energy Corp., 957 F.Supp.2d at 332, if the meaning of Section 1.7 could not be ascertained even after consideration of extrinsic evidence, the court could apply the doctrine of contra proferentem.